54 F.3d 465
 Merilyn LUDWIG, Special Administrator of the Estate of James
Robert Ludwig, Deceased, Plaintiff-Appellant
v.
Charles ANDERSON, individually and as a police officer for
the City of St. Paul; Joseph Strong, individually and as a
police officer for the City of St. Paul; City of St. Paul,
a municipal corporation, Defendants-Appellees.
 No. 93-3157.
 United States Court of Appeals,
Eighth Circuit.
 Submitted May 12, 1994.
Decided May 1, 1995.
Rehearing and Suggestion for Rehearing En Banc Denied June 15, 1995.
 
 Daniel J. Rice, Oak Park, IL, argued, for appellant.
 Pamela F. Hutton, St. Paul, MN, argued, for appellee.
 Before MAGILL, Circuit Judge, FLOYD R. GIBSON and JOHN R. GIBSON, Senior Circuit Judges.
 JOHN R. GIBSON, Senior Circuit Judge.
 
 
 1
 Merilyn Ludwig, Special Administrator of the Estate of her son, James Ludwig, appeals the district court's grant of partial summary judgment, dismissing from this case Charles Anderson and Joseph Strong, two St. Paul, Minnesota, police officers, on the basis of qualified immunity. Ludwig v. Anderson, Civil No. 4-91-733 (D.Minn. June 21, 1993).[1] We reverse.
 
 
 2
 On September 22, 1990, Sergeant Anderson and Officer Strong shot and killed James Ludwig. Initially, a concerned citizen called the police regarding Ludwig, who had been camping behind a Wendy's near the caller's home. The caller told the police that Ludwig was "not in a right frame of mind ... cause he's got his shoes off, and he's talking about his feet got jungle rot, and he's talking about Vietnam and all." The caller further stated that children frequented this area and that although "[Ludwig] might not be doing nothing wrong, ... he might be sick or need some help." Officer Denise Hossalla was dispatched to investigate:
 
 
 3
 Clarence and Maryland on an emotionally disturbed person. Comp. says a man's been sleeping behind Wendy's for the past several days. The person talks crazy stuff about Vietnam. Comp. is concerned about the kids in the area.
 
 
 4
 Hossalla arrived at the Wendy's and saw a motorcycle partially covered with a black tarp, one end of which was fastened to a tree to form a shelter. Hossalla also noticed the word "constitution" written in the dirt and a drawing of a stop sign with the word "stop" written inside. Ludwig was wearing a blue cloth around his head, mirrored sunglasses, blue jeans, shoes, leather gloves and a blue poncho over a brown leather jacket. Hossalla was in uniform and driving a semi-marked squad car. Hossalla reported that "[a]fter I entered his area he began talking about something that had nothing to do with why I was there." Ludwig called the place his "domain" and invited Hossalla to come in and sit down. She told Ludwig that people were worried about him because of the cold. Ludwig replied that was why he had built the shelter and asked her if she wanted to see his identification. Ludwig pulled off his right glove, dropped it to the ground, and reached under his poncho. Hossalla described Ludwig as initially cooperative.
 
 
 5
 Then Officer Richard Munoz arrived, uniformed and in a marked squad car. Ludwig became excited, stating that he didn't want two cops in his domain. Hossalla began to think that Ludwig might be emotionally disturbed.
 
 
 6
 Ludwig handed Munoz his identification, moving toward Munoz with a "martial arts type of side step," one step sideways, then behind and then another step. Neither Hossalla nor Munoz ran a radio check on Ludwig's identification, contrary to standard procedure.
 
 
 7
 Ludwig then put his hand back under his poncho. Munoz pulled his service revolver and, in a loud voice, ordered Ludwig to reveal his hand, although Munoz understood that this conduct might agitate an emotionally disturbed person. Both Munoz and Hossalla continued to order Ludwig to reveal his hand, but Ludwig replied that he didn't have to do so. Both officers asked Ludwig to take a seat in the squad car and continued to order Ludwig to take his hand out from under his poncho, but Ludwig began backing into the shopping center parking lot. Hossalla noticed that Ludwig had a strong grip on something underneath his poncho, based on the angle and rigidity of his arm. Hossalla then called for assistance. Ludwig began to kneel down with his right hand still under his poncho. Munoz then sprayed Ludwig in the chest with mace. Ludwig did not appear to be affected and continued walking backwards away from them.
 
 
 8
 Two more squad cars pulled into the lot. Ludwig pulled a knife and crouched, with staggered legs and bent knees. Hossalla drew her gun. Both Munoz and Hossalla pointed their guns at Ludwig.
 
 
 9
 Other police cars arrived, although it is difficult from the record to determine the exact order of their arrival. Robert Lodmell arrived on the scene with lights activated, but later turned them off because he knew that Ludwig was potentially emotionally disturbed, and Lodmell "didn't want to go to the scene with red lights and a siren to aggravate anything else that might be going on." Strong and Michael Johnson arrived in time to see Ludwig holding the knife and stepping sideways away from Munoz and Hossalla. Ronald Sherbert arrived with his squad car lights on and remained in his car to block Ludwig's access to the health club.
 
 
 10
 Ludwig turned and began running north through the woods, the only direction he could run without confronting police. Hossalla, Munoz, Johnson, Lodmell and Strong chased him on foot. Sherbert saw Ludwig running up the hill, moved his squad car to the top of the hill and got out.
 
 
 11
 Sergeant Anderson, the ranking officer, heard the initial dispatch to Hossalla. Although he later denied hearing that Ludwig was emotionally disturbed, during the internal investigation of Ludwig's death, he stated that the initial dispatch was "to check on a person ... that sounded emotionally disturbed." Anderson arrived with lights on, siren off, and saw all of the officers facing Ludwig with guns drawn. Anderson saw Ludwig running up the hill and drove to the top of the hill.
 
 
 12
 When Ludwig reached the top of the hill, he stopped, crouched, and said he was tired. Anderson saw an opportunity to "stop [Ludwig] by using the squad [car] to disrupt his movement by hitting him." Approximately 100 feet from Ludwig, while traveling 30-40 miles per hour, Anderson decided to hit Ludwig with the car because Ludwig was "displaying an intent to use deadly force and containment efforts had so far failed." Anderson braked the car very close to Ludwig and states that his car was almost stopped, but still moving, when it hit Ludwig. However, Strong saw Anderson's attempt and estimated that Anderson's car was still moving approximately 10 to 15 miles per hour when it hit Ludwig. Ludwig turned, put a hand on the hood of Anderson's squad car and vaulted over and around the front of the car.
 
 
 13
 After Anderson's failed attempt to hit Ludwig, the officers formed a semicircle around Ludwig and continued to order him to take his hand out from under his poncho and drop the knife. Anderson joined the group, drew his gun and asked Ludwig to drop the knife. Ludwig switched the knife from hand to hand, holding it alternately by the blade and handle. Hossalla later stated that it looked as if Ludwig might throw the knife. Ludwig asked Anderson his name and badge number. Anderson answered and told Ludwig to sit down on the curb. Ludwig refused Anderson's requests and orders and countered them with "things that didn't make sense" and "weren't relative to what [Anderson] was asking." Ludwig told the police they were going to have to kill him. Although Anderson knew this could be characteristic of an emotionally disturbed person, he now claims uncertainty as to whether Ludwig was emotionally disturbed because Ludwig was "maintaining a calm, calculated reaction or actions." Anderson observed no nervousness about Ludwig and stated that Ludwig's voice did not appear excited. "Although he remarked to an order or request to put the knife down with what's my name or what's my badge number, he did that in a manner with thought rather than as a reaction. He wasn't excited."
 
 
 14
 Anderson then ordered Simmons to mace Ludwig, knowing that macing emotionally disturbed persons may disturb them more. Simmons stated that he had received no instruction that mace should be avoided with emotionally disturbed persons. Simmons maced Ludwig in the face. Ludwig immediately turned and ran towards Barclay Street where Anderson could see pedestrians. Without firing a warning shot or yelling a warning, Anderson shot Ludwig twice from approximately 8 to 15 feet.[2] Anderson fired the second shot a second or less after the first. Ludwig flinched, but continued running. Strong yelled that he had the shotgun, and Anderson told him to go ahead, although Strong does not recall Anderson telling him to fire. Strong fired and Ludwig immediately fell face down. Approximately one to two seconds elapsed between Anderson's shots and Strong's shot. Anderson estimated that the entire incident, from the time of the dispatch to the time the paramedics were called, was "better than five minutes, as much as ten minutes."
 
 
 15
 At the time he shot Ludwig, Strong stated that he was in no immediate fear for his own safety due to the distance between himself and Ludwig and because Ludwig was running away. Strong shot "to stop Mr. Ludwig from possibly attempting to get across the street, which he would then be in contact with other citizens that were in the project, or the apartment building, in that area and he could do harm." However, Strong stated that, before he shot Ludwig, the closest Ludwig got to a bystander was approximately 50 feet, and, if he had continued running in the direction he was running when shot, none of the visible bystanders would have been in harm's way. When Ludwig was shot, he was running away from all bystanders, the nearest of whom were across the street approximately 150 feet from Ludwig.
 
 
 16
 Simmons stated that Ludwig did not lunge at any police officer or run towards any police officer from the time Simmons arrived on the scene until the time of the shooting. Lodmell also stated that, although Ludwig waved the knife at the officers, he did not move towards any of them. Strong himself stated that Ludwig remained in a defensive stance and did not move toward any officer. Johnson recalled Ludwig actually stepping towards an officer only once, when Ludwig stopped running at the top of the hill, turned toward Johnson, and moved one foot in his direction. Johnson further stated that "[t]he entire time that we were chasing him he was yelling things that didn't make sense." In contrast, at deposition, Anderson contended that Ludwig was "lunging" at the officers with his knife, although he did not so assert in his original police report.
 
 
 17
 Anderson, Hossalla, Munoz, Sherbert, and Strong were deposed prior to argument on the summary judgment motion. Johnson, Lodmell, and Simmons were deposed following that date. In their brief, defense counsel state that they "will assume that this record now includes the three police officer depositions taken after motion argument on March 5, 1993, in the event plaintiff wishes to point to any so-called material, genuine 'discrepancy' elicited or inferable therefrom." Therefore, we assume the same. Among other documents, the district court also considered an affidavit by Ludwig's expert, Dr. George Kirkham. Dr. Kirkham stated that the officers "violated well established standards and procedures of the law enforcement profession" and that the force used against Ludwig was "grossly excessive and unreasonable under the circumstances."
 
 
 18
 Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). We review the district court's grant of summary judgment de novo, applying the same standard as that court applied. Get Away Club, Inc. v. Coleman, 969 F.2d 664, 666 (8th Cir.1992). We view the evidence in favor of Merilyn Ludwig, the nonmoving party, and draw all justifiable inferences in her favor.[3] Schrader v. Royal Caribbean Cruise Line, Inc., 952 F.2d 1008, 1013 (8th Cir.1991). We have set forth the evidence above under this standard.
 
 
 19
 Under the doctrine of qualified immunity, government officials performing discretionary tasks are shielded from liability for civil damages unless their conduct violates "clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982). The contour of the violated rights "must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." Anderson v. Creighton, 483 U.S. 635, 640, 107 S.Ct. 3034, 3039, 97 L.Ed.2d 523 (1987). Qualified immunity "gives ample room for mistaken judgments" but does not protect "the plainly incompetent or those who knowingly violate the law." Malley v. Briggs, 475 U.S. 335, 343, 341, 106 S.Ct. 1092, 1097, 1096, 89 L.Ed.2d 271 (1986).
 
 
 20
 The applicability of qualified immunity is a question of law, id., which we analyze in three parts. Get Away Club, 969 F.2d at 666-67. First, has Merilyn Ludwig asserted, on behalf of her son, a violation of a constitutional right by Sergeant Anderson or Officer Strong? Id. at 666; Siegert v. Gilley, 500 U.S. 226, 232, 111 S.Ct. 1789, 1793, 114 L.Ed.2d 277 (1991). Second, if Merilyn Ludwig has asserted such a violation, was the "applicable law pertaining to the constitutional right in question ... clearly established" at the time of the violation? Id. at 666 (internal quotations omitted); Siegert, 500 U.S. at 232, 111 S.Ct. at 1793. Finally, if Sergeant Anderson or Officer Strong violated clearly established law, have they established that no material issues of fact remain as to the objective reasonableness of their actions in light of the law and the information they possessed at the time? Get Away Club, 969 F.2d at 667. In essence, we must inquire "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251-52, 106 S.Ct. 2505, 2512, 91 L.Ed.2d 202 (1986). To preclude summary judgment, the factual disagreement "must be outcome determinative under prevailing law." Get Away Club, 969 F.2d at 666 (internal quotations and citation omitted).
 
 
 21
 Apprehension by deadly force is a seizure subject to the Fourth Amendment.[4] Tennessee v. Garner, 471 U.S. 1, 7, 105 S.Ct. 1694, 1699, 85 L.Ed.2d 1 (1985); U.S. Const. amend. IV. There is no question but that Ludwig was "seized" within the meaning of the Fourth Amendment. Krueger v. Fuhr, 991 F.2d 435, 438 (8th Cir.), cert. denied, --- U.S. ----, 114 S.Ct. 386, 126 L.Ed.2d 335 (1993). Thus, the remaining questions are: (1) what seizures occurred, Cole v. Bone, 993 F.2d 1328, 1333 (8th Cir.1993) (en banc); and (2) whether those seizures were objectively reasonable within the meaning of the Fourth Amendment. Krueger, 991 F.2d at 438 (holding that officers were entitled to qualified immunity for shooting fleeing, presumably armed man suspected of drug use and armed assault). See Schulz v. Long, 44 F.3d 643, 648 (8th Cir.1995) (holding that the two issues listed above are relevant to a case of unreasonably excessive force).
 
 
 22
 We have held that a seizure does not occur during the course of a police pursuit unless the pursuit produces a stop. Cole, 993 F.2d at 1332. However, in Cole, we cited California v. Hodari D., 499 U.S. 621, 626, 111 S.Ct. 1547, 1550, 113 L.Ed.2d 690 (1991), for the proposition that a seizure occurs when either the citizen submits to an assertion of authority or physical force is applied, regardless of whether the citizen yields to that force. Cole, 993 F.2d at 1332. Although a seizure is "effected by the slightest application of physical force" despite later escape, that seizure does not continue during "period[s] of fugitivity." Hodari D., 499 U.S. at 625, 111 S.Ct. at 1550. Thus, in determining the issue of Fourth Amendment reasonableness, the district court should scrutinize only the seizure or seizures themselves, not the events leading to them. Schulz, 44 F.3d at 648-49; Cole, 993 F.2d at 1333. In doing so, Hodari D. instructs that many different seizures may occur during a single series of events. Hodari D., 499 U.S. at 625, 111 S.Ct. at 1550. Applying these principles, we hold that Ludwig was twice seized in a potentially unreasonable manner: first, when Anderson attempted to hit Ludwig with the squad car, and second, when Ludwig was ultimately shot. Although the police may be said to have seized Ludwig by twice applying mace (i.e., applying physical force although unsuccessful), we hold that they violated no clearly established right by macing Ludwig.
 
 
 23
 The remaining question is whether Anderson and Strong have shown that the squad car attempt and the shooting were objectively reasonable in light of the law and the information they possessed at the time. Get Away Club, 969 F.2d at 667. To determine objective reasonableness, we must balance "the nature and quality of the intrusion on [Ludwig's] Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion." Garner, 471 U.S. at 8, 105 S.Ct. at 1699 (citations and internal quotations omitted). Then we must determine whether the totality of the circumstances surrounding the incident justifies seizure by the use of deadly force. Id. at 8-9, 105 S.Ct. at 1699-1700.
 
 
 24
 The Supreme Court in Garner defined constitutionally reasonable deadly force:
 
 
 25
 Where the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others, it is not constitutionally unreasonable to prevent escape by using deadly force. Thus, if the suspect threatens the officer with a weapon or there is probable cause to believe that he has committed a crime involving the infliction or threatened infliction of serious physical harm, deadly force may be used if necessary to prevent escape, and if, where feasible, some warning has been given.
 
 
 26
 Id. at 11-12, 105 S.Ct. at 1701. This standard governs any seizure involving the use of deadly force by a police officer.
 
 
 27
 The intrusiveness of a seizure by deadly force is "unmatched." Id. at 9, 105 S.Ct. at 1700. Such a seizure also "frustrates the interest of the individual, and of society, in judicial determination of guilt and punishment." Id. When, as here, the person seized is not a "suspect," has committed no crime when the police approach,[5] and is provoked by police escalation of the situation, the "importance of the governmental interests alleged to justify the intrusion" is necessarily diminished. Furthermore:
 
 
 28
 It is not better that all felony suspects die than that they escape. Where the suspect poses no immediate threat to the officer and no threat to others, the harm resulting from failing to apprehend him does not justify the use of deadly force to do so. It is no doubt unfortunate when a suspect who is in sight escapes, but the fact that the police arrive a little late or are a little slower afoot does not always justify killing the suspect.
 
 
 29
 471 U.S. at 11, 105 S.Ct. at 1701. Thus, the question here is whether Ludwig posed an immediate threat to the officers or others.
 
 
 30
 The district court held that, under the circumstances of this case, "the use of deadly force by [Anderson and Strong] was not objectively unreasonable" and that it was "objectively reasonable for [them] to believe that Ludwig posed a serious and immediate danger of physical harm to bystanders in the vicinity." Ludwig, slip op. at 12. The court found that Ludwig's actions in waving the knife and running away, coupled with the presence of bystanders, indicated "dangerous, threatening, or aggressive actions." Id. Further, the district court held that whether Ludwig was emotionally disturbed was of no consequence.
 
 
 31
 We disagree with the district court's conclusion that "whether Ludwig was emotionally disturbed is not material to the reasonableness of the officers' actions," Ludwig, slip op. at 14 n. 4, for the following reasons: (1) defense counsel concedes that Ludwig was emotionally disturbed; (2) both Anderson and Strong had been trained in the detection and handling of emotionally disturbed persons; and (3) standard police procedure regarding emotionally disturbed persons differs greatly from that regarding emotionally stable persons.
 
 
 32
 The St. Paul police manual specifically instructs officers on the use of force and the handling of emotionally disturbed persons. The manual states that although reasonable physical force may be "necessary in situations which cannot be otherwise controlled, force may not be resorted to unless other reasonable alternatives have been exhausted or would clearly be ineffective under the particular circumstances." The manual further instructs that "[n]othwithstanding, the existence of facts and circumstances authorizing the use of deadly force every member of the department shall, in all cases, use only the minimum amount of force consistent with the accomplishment of his mission and shall exhaust every other reasonable means of apprehension or defense before resorting to deadly force." The manual authorizes an officer to use deadly force "only when necessary: 1. To protect the peace officer or another from apparent death or great bodily harm; ..." The remaining provisions of the same section involve persons whom the officer knows or has reason to know has committed or attempted to commit a felony; as discussed in Footnote 5, Ludwig is not such a person. Finally, "[n]o member of the Department of Police shall discharge a firearm in circumstances involving a misdemeanor or gross misdemeanor."
 
 
 33
 The manual specifically instructs officers when dealing with "mental cases" or emotionally disturbed persons:
 
 B. Arrival
 
 34
 1. Estimate situation and reduce any exciting influences.
 
 
 35
 2. Take action to protect yourself and others present, including patient.
 
 
 36
 3. If possible, get all information that is available through witnesses, family and others.
 
 
 37
 If the person is agitated, but not yet violent, the manual recommends that the officer "reduce fear, anxiety and tension in the patient" by avoiding "any show of force," establishing "friendly or understanding relationship with patient," and, where possible, determining "whom he trusts or has faith in and summon[ing] [them] to the scene." The manual further instructs officers dealing with emotionally disturbed persons to "[p]ractice restraint and patience" because "[h]aste sometimes aggravates the situation."
 
 
 38
 Although these "police department guidelines do not create a constitutional right," Cole, 993 F.2d at 1334, they are relevant to the analysis of constitutionally excessive force. See Garner, 471 U.S. at 18-19, 105 S.Ct. at 1704-05. This is not to say that Ludwig's status as an emotionally disturbed person entitles him to any additional, clearly established constitutional rights which would be relevant to the qualified immunity determination. Rather, Ludwig's emotionally disturbed status may be relevant to the trial court's determination of objective reasonableness in the substantive portion of this trial. This disparity in relevance stems from the difference between qualified immunity and the merits. See Gainor v. Rogers, 973 F.2d 1379, 1383 (8th Cir.1992). "The issue on the merits is whether the officer violated the law when the arrest was made, whereas the immunity question is whether the officer violated clearly established law when the arrest was made." Id. (citing Mitchell v. Forsyth, 472 U.S. 511, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985)).
 
 
 39
 While the question of qualified immunity here is close, and although some facts may ultimately support either side, we reverse and hold that material questions of fact remain as to whether Ludwig's actions at the time of the shooting, even if "dangerous, threatening, or aggressive," Ludwig, slip op. at 12, "pose[d] a threat of serious physical harm" as required by Garner. 471 U.S. at 11-12, 105 S.Ct. at 1701. In so holding, we have considered whether the officers reasonably believed the following: (1) that Ludwig posed a serious risk of physical harm; and (2) that deadly force was necessary to prevent his escape. See id. at 11, 105 S.Ct. at 1701.
 
 
 40
 As a preliminary matter, we conclude that an attempt to hit an individual with a moving squad car is an attempt to apprehend by use of deadly force. While driving his squad car from 100 feet away at approximately 30 to 40 miles per hour, Anderson decided to hit Ludwig with his squad car. Although Anderson contends he was almost stopped when his car came into contact with Ludwig, Strong estimated that Anderson's car was traveling 10 to 15 miles per hour when it hit Ludwig. Just before this attempt, Ludwig had stopped running and admitted that he was tired.
 
 
 41
 Material issues of fact remain as to whether Anderson used deadly force. If the car was almost stopped and Anderson was using it solely as a barricade, the force used was not per se unreasonable. If, however, Anderson's car was moving 15 miles per hour, Anderson used arguably unreasonable deadly force. Without impermissible determinations of fact and credibility, see Abbott v. City of Crocker, 30 F.3d 994, 997 (8th Cir.1994), we can not conclude that Anderson is entitled to summary judgment based on qualified immunity for his attempt to hit Ludwig with a squad car.
 
 
 42
 Material issues of fact also remain as to whether the shooting itself was objectively reasonable. At the time Ludwig was shot, eight officers were on the scene. Viewing the evidence in the light most favorable to Merilyn Ludwig, the distance from Ludwig to the nearest bystander at the time of the shooting was approximately 150 feet, and, if Ludwig had continued running in the direction he was running when shot, he would have increased that distance. At the time of the shooting, the officers had only seen Ludwig with a knife and had not seen, nor did Ludwig possess, any other weapon. Strong stated that Ludwig was in a defensive posture and never moved towards any officer. At the time he shot, Strong admittedly did not fear for his own safety due to the distance between himself and Ludwig and because Ludwig was running away. Strong stated that he shot Ludwig to keep him from "possibly attempting" to get closer to the bystanders, although Ludwig was not then attempting to do so. Although the officers uniformly contend that deadly force was justified, the depositions of the officers are internally inconsistent on several points, including: (1) the distance to the nearest bystander at the time of the shooting;[6] (2) whether Ludwig was running toward any police officers or bystanders at the time he was shot;[7] (3) the number and location of bystanders at the time of the shooting;[8] and (4) whether, at any time, Ludwig moved toward a police officer.[9]
 
 
 43
 In light of the number of officers present, the factual inconsistencies about what the officers knew and who was endangered at the time of the shooting, as well as Ludwig's expert's affidavit, we believe that material issues of fact remain as to whether Ludwig posed a risk such that his flight required apprehension by deadly force. Although it is a question of law whether particular facts entitle police officers to summary judgment based on qualified immunity, where, as here, "there is a genuine dispute concerning predicate facts material to the qualified immunity issue, there can be no summary judgment." Greiner v. City of Champlin, 27 F.3d 1346, 1352 (8th Cir.1994). The evidence in this case presents material issues of fact on which the issue of qualified immunity turns and "presents a sufficient disagreement to require submission to a jury." Anderson, 477 U.S. at 251-52, 106 S.Ct. at 2512.
 
 
 44
 Finally, Garner requires the officer to give a warning "where feasible." 471 U.S. at 11-12, 105 S.Ct. at 1701. Viewing the facts most favorably to Merilyn Ludwig, neither Anderson nor Strong gave Ludwig any warning immediately before shooting him. The absence of a final warning does not automatically "render [an officer's] use of deadly force constitutionally unreasonable." Krueger, 991 F.2d at 440. However, when combined, as here, with a potentially unconstitutional application of deadly force, the failure of both Strong and Anderson to warn Ludwig serves only to exacerbate the circumstances.
 
 
 45
 In a case of qualified immunity, "[w]here an official could be expected to know that certain conduct would violate statutory or constitutional rights, he should be made to hesitate; and a person who suffers injury caused by such conduct may have a cause of action." Harlow, 457 U.S. at 819, 102 S.Ct. at 2739. Here, Sergeant Anderson and Officer Strong could be expected to know that shooting Ludwig under the circumstances then present would violate Ludwig's constitutional rights. They did not hesitate, but rather shot and killed Ludwig. Considering the totality of the circumstances, we can not escape the conclusion that Anderson and Strong fatally shot Ludwig after St. Paul police suspected him initially of being homeless and emotionally disturbed, and, later, of misdemeanor criminal activity which arguably placed no one in immediate harm. See Rowland v. Perry, 41 F.3d 167, 173-74 (4th Cir.1994). Under the facts outlined above and because of the factual inconsistencies in the depositions and other documents before this court, Ludwig's cause of action should be allowed to proceed to trial.
 
 
 46
 We reverse the judgment of the district court and remand for trial consistent with this decision.
 
 
 
 [1]
 The case remains pending against the City of St. Paul
 
 
 [2]
 Strong testified that the distance between Anderson and Ludwig was 8 to 15 feet. Anderson testified that the distance was approximately 25 feet
 
 
 [3]
 Deadly force cases pose a unique evidentiary problem because the police officer defendants and their colleagues are often the only surviving eyewitnesses, while the person most likely to contradict their story is dead. See Scott v. Henrich, 39 F.3d 912, 915 (9th Cir.1994). This is just such a case
 
 
 [4]
 Although the complaint alleged several constitutional violations, we analyze all claims of excessive force under the Fourth Amendment reasonableness standard, rather than under a substantive due process standard. Graham v. Connor, 490 U.S. 386, 395, 109 S.Ct. 1865, 1871, 104 L.Ed.2d 443 (1989)
 
 
 [5]
 Although the felony-misdemeanor distinction is no longer controlling, Garner, 471 U.S. at 11-15, 105 S.Ct. at 1701-03, at the time of the shooting, the only criminal acts which defense counsel allege Ludwig committed were misdemeanors. See St. Paul, Minn., Code Sec. 225.03 (1987) (possession of a knife without a permit, punishable under Sec. 1.05 as a misdemeanor with a maximum of 90 days imprisonment); Minn.Stat. Secs. 609.224 and 609.66, Subd. 1 (assault in the fifth degree involving a dangerous weapon, punishable as a misdemeanor with a maximum of 90 days imprisonment)
 
 
 [6]
 Officer Strong testified that the closest Ludwig got to a bystander was approximately 50 feet. However, Officer Johnson testified that, when the shots were fired, "the people [were] 50 yards southeast of [Ludwig's] location."
 
 
 [7]
 Officer Lodmell testified that Ludwig was running toward people when he was shot, but Officer Strong testified that, if Ludwig had continued running in the direction he was running when shot, nobody would have been in immediate harm
 
 
 [8]
 Sergeant Anderson testified that he saw people gathering when the police surrounded Ludwig in the semi-circle, but didn't recall how many. He stated that he was no longer concerned for those people when Ludwig continued running away, but testified to additional people to the east and south of Ludwig
 Officer Strong testified that: "My decision for shooting was to stop Mr. Ludwig from possibly attempting to get across the street, which he would then be in contact with other citizens that were in the project, or the apartment building, in that area and he could do harm." Strong recalled bystanders standing by apartment buildings on the east side of Barclay. He estimated "more than five" bystanders at the time of the shooting.
 Officer Lodmell testified that Ludwig was running on the west side of Barclay when he was shot, and that other than police officers, no people were on that side of the street. Lodmell testified regarding some people in a car at the intersection of Rose and Barclay, as well as pedestrians on the north and southwest corners.
 
 
 [9]
 Officer Lodmell testified that Ludwig stayed in pretty much the same place while in the semicircle and did not move towards any police officer. Lodmell testified that he was not in fear of harm at that time
 Sergeant Anderson described Ludwig's movements while in the semicircle: "As he is moving backwards the officers are in front of him, and although his legs, his feet, are carrying his body motion backwards, he makes forward lunging movements towards those officers." Anderson stated that Ludwig's general direction was backwards.
 Officer Johnson testified Ludwig "waved the knife as if throwing it to [Anderson]," but Johnson never saw Ludwig move his body towards Anderson. Johnson testified that he only saw Ludwig step towards Johnson, and that then Ludwig moved only one foot, one step towards him.
 Officer Simmons testified that he never saw Ludwig run towards a police officer.