William MILLER, Plaintiff,

v.

ACE USA, D/B/A Ace American
Insurance Company,
Defendant.

No. Civ.02–4237ADM/AJB.

United States District Court,
D. Minnesota.

May 8, 2003.

Christopher H. Yetka, and Marnie L. DeWall, Lindquist & Vennum, P.L.L.P., Minneapolis, MN, for Plaintiff.

Jeffrey M. Thompson, Meagher & Geer, P.L.L.P., Minneapolis, MN, for and on behalf of Defendant.

## MEMORANDUM OPINION AND ORDER

MONTGOMERY, District Judge.

### I. INTRODUCTION

This matter is before the undersigned United States District Judge on the cross Motions for Summary Judgment of Plaintiff William Miller ("Miller") and Defendant ACE USA, d/b/a Ace American In-surance Company ("ACE") [Docket Nos. 10, 8, 14]. Miller seeks a declaratory judgment that ACE has a duty to defend a third-party action against him, while ACE requests summary judgment on all counts of the Complaint, or, alternatively, on the claims of breach of fiduciary duty and breach of the duty of good faith and fair dealing. Oral argument of the Motions was heard on March 12, 2003. For the reasons stated below, Miller's Motion is denied and ACE's Motion is granted.

### II. BACKGROUND

#### A. The Policy

The insurance policy under which this coverage dispute arises is a claims-made Directors & Officers and Company policy ("D & O Policy" or "Policy"), purchased by Worldtrak Corporation ("Worldtrak") from ACE, effective March 22, 2002 to March 22, 2003. During this period, Miller was employed by Worldtrak as Chief Financial Officer ("CFO") of the company. There is no dispute that, as an officer of Worldtrak, Miller was covered by the D & O Policy.

Worldtrak purchased only the D & O coverage, which included the General Terms and Conditions section applicable to and provided with all ACE policies. The Insuring Clause of the D & O Policy states that: "Insurer shall pay on behalf of the Directors and Officers Loss resulting from any Claim first made against the Directors and Officers during the Policy Period for a Wrongful Act." D & O Policy ¶ A(1) (Yetka Aff. Ex. A). "Loss means damages, settlements and Costs, Charges and Expenses incurred by any of the Directors and Officers under Insuring Clause[ ] 1 ..." and "Costs, Charges and Expenses means reasonable and necessary legal fees and expenses incurred by any of the Insureds in defense of any Claim...." *Id.* ¶ B(7), (4). "Claim" is defined as:

a) any written or oral demand for damages or other relief against any of the Insureds, and

b) any judicial, administrative or arbitration proceeding initiated against any of the Insureds in which they may be subjected to a binding adjudication of liability for damages or other relief, including any appeal therefrom.

*Id.* ¶ B(2). "Wrongful Act" is defined as "any actual or alleged error, omission, misleading statement, neglect, breach of duty or act by" any of the "Directors and Officers" acting in their capacity as "a director, officer or employee of the Company." *Id.* ¶ B(9).

## B. The Hintz Action

The parties contest whether or not this policy provides coverage for a lawsuit brought by Sandra Hintz ("Hintz"), a former Worldtrak employee, against Worldtrak, Axonom, Inc.,[1] Miller, and Clark Dircz ("Dircz"), Chief Executive Officer of Worldtrak during the policy period. Hintz's complaint (the "Hintz Complaint") sets forth nine Counts: (I) sex discrimination in violation of Title VII; (II) sex discrimination in violation of the Minnesota Human Rights Act; (III) reprisal in violation of Title VII; (IV) reprisal in violation of the Minnesota Human Rights Act; (V) violation of Minnesota Parenting Leave Act; (VI) negligent supervision and retention; (VII) negligent infliction of emotional distress; (VIII) assault and battery; and (IX) aiding and abetting and obstruction in violation of the Minnesota Human Rights Act. Hintz Complaint (Yetka Aff. Ex. B).

The factual allegations underlying these causes of action describe a pattern of sexual advances and harassment by Dircz, followed by discriminatory and retaliatory treatment upon Hintz's announcement of her marriage and pregnancy. *Id.* ¶¶ 12–28. Hintz alleges that she was advised to work only part-time because her pregnancy was affecting her job, and that the duties of her position were no longer needed, prompting her to file a charge of discrimination with the Equal Employment Opportunity Commission. *Id.* ¶¶ 18–23. She asserts that shortly after this time she was given the choice of resignation or employment without pay and finally informed by Miller that all Worldtrak employees were terminated. *Id.* ¶ 25. Additionally, Hintz avers that the transfer of business from Worldtrak to Axonom was done to escape liability to her for sexual harassment and as part of a plan to defraud Worldtrak's shareholders. *Id.* ¶ 26.

Upon receipt of the Hintz Complaint, Miller sought defense and indemnification from ACE under the terms of the D & O Policy. ACE denied coverage and Miller brought the instant suit, seeking reimbursement of attorney's fees and expenses incurred in both this and the Hintz action, a declaratory judgment of ACE's duty to defend and indemnify, and alleging breach of contract, breach of fiduciary duty, and breach of the duty of good faith and fair dealing. Miller presently moves for summary judgment only with respect to the duty to defend. In its cross Motion, ACE requests summary judgment on this suit in its entirety or, alternatively, on Miller's fiduciary duty and good faith and fair dealing claims.

## III. DISCUSSION

### A. Standard for Summary Judgment

Rule 56(c) of the Federal Rules of Civil Procedure provides that the court shall

---

1. According to the Hintz Complaint, Axonom, Inc. is a Minnesota corporation to which all of Worldtrak's assets were transferred after Worldtrak went out of business. Hintz Complaint ¶¶ 7, 26 (Yetka Aff. Ex. B).

render summary judgment if there exists no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *see Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

On a motion for summary judgment, the court views the evidence in the light most favorable to the nonmoving party. *Ludwig v. Anderson*, 54 F.3d 465, 470 (8th Cir.1995). However, the nonmoving party may not "rest on mere allegations or denials, but must demonstrate on the record the existence of specific facts which create a genuine issue for trial." *Krenik v. County of Le Sueur*, 47 F.3d 953, 957 (8th Cir.1995).

## B. Duty to Defend

The insurer has a duty to defend all claims against the insured if any one of the asserted causes of action is arguably within the scope of policy coverage. *Metropolitan Property and Cas. Ins. Co. and Affiliates v. Miller*, 589 N.W.2d 297, 299 (Minn. 1999). The duty to defend is broader than the distinct duty to indemnify. *Id.* To avoid this obligation, the insurer must establish that all claims clearly fall outside the policy. *Id.* The duty to defend is determined by comparing the allegations of the complaint against the insured to the language of the insurance contract and assessing whether the claims "state a cause of action within the coverage afforded by the policy." *Meadowbrook, Inc. v. Tower Ins. Co.*, 559 N.W.2d 411, 419 (Minn.1997); *Garvis v. Employers Mut. Cas. Co.*, 497 N.W.2d 254, 256 (Minn.1993).

Miller avers that the Hintz complaint contains allegations arguably giving rise to coverage under the D & O Policy. Additionally, he asserts that none of the Policy exclusions apply. ACE argues that the action is entirely employment-related and therefore is clearly excluded from the term of coverage. It contends that an isolated factual allegation without reference or relation to any asserted claim cannot support a duty to defend.

### 1. Allegations of the Complaint

■ To establish that the Hintz Complaint includes a claim within the scope of the Policy, Miller asserts that certain factual allegations arguably imply a shareholder cause of action. He relies on the portion of paragraph 26 that states: "Upon information and belief, this [the cessation of business of Worldtrak and transfer of work and assets to Axonom] was also part of a plan by Worldtrak to defraud its shareholders and/or investors, including Plaintiff, by devaluing the worth of Worldtrak." Hintz Complaint ¶ 26. Because no fraud or shareholder claim is a numerated count of the Hintz Complaint, *see supra* p. 1132, Miller's assertion that this language creates arguable coverage necessarily depends on his argument that the duty to defend is not limited to specific causes of action, but extends to facts and assertions generally pleaded.

■ Though the duty to defend exists irrespective of the merit of the underlying claims against the insured, it does not mandate defense for claims "that could have been made (for example, are suggested by the fact pattern) but were not." *Reinsurance Ass'n of Minn. v. Timmer*, 641 N.W.2d 302, 311 (Minn.Ct.App.2002). The reviewing court should focus on the claims set forth, not the *"conduct* being asserted to prove the *claim[s]."* *Meadowbrook*, 559 N.W.2d at 420 (emphasis in original). Miller emphasizes that Minnesota courts refer not only to

"claims" and "causes of action" when comparing complaint content to policy language, but also to "allegations in the complaint," arguing, therefore, that claims triggering the duty to defend need not be contained in a specific count or cause of action. *Meadowbrook,* 559 N.W.2d at 415. While an accurate reflection of terminology use, this argument does not extend to potential claims suggested or intimated by the facts of the complaint, but not included among the particularized counts. *See Timmer,* 641 N.W.2d at 311 ("For purposes of determining arguable coverage, we will limit ourselves to the causes of action alleged in the complaint."). The underlying factual circumstances recited by a plaintiff may provide a duty to defend a cause of action that could arguably be based on more than one legal theory, such as facts asserting intentional and negligent conduct within a complaint stating a generic claim for infliction of emotional distress, but should not be converted into possible, but not asserted, causes of action. *See id.*

On its face, the Hintz Complaint includes no shareholder or securities causes of action. Miller maintains, however, that Count VII, labeled Negligent Infliction of Emotional Distress, asserts a broader negligence claim that incorporates the purported allegations of fraud. Putting aside questions that would be raised by a claim of fraud based on simple negligence, there is no indication in the remainder of the Hintz Complaint, especially in the list of causes of action specifically set forth, of a shareholder derivative or securities devaluation suit. Furthermore, the "Factual Allegations," on which Miller relies, include no explicit allegations against Miller of fraud or breach of fiduciary duty. Instead, he is named in relation to the alleged discrimination and retaliation against Hintz, with Hintz asserting that Miller attempted to dissuade her from filing a charge of discrimination, and implying that Miller attempted to obstruct her pursuit of this charge by causing inculpating e-mail to be deleted from her account. *Id.* ¶¶ 23, 28. Hintz also states Miller was the person who informed her all Worldtrak employees were terminated. *Id.* ¶ 25.

In fact, the focal paragraph 26 itself, recites Miller's name only in the context of Hintz's discrimination complaint, tying the sale of Worldtrak's assets to an alleged plan by Miller and the other defendants to retaliate against Hintz and "escape liability for sexually harassing" her. *Id.* ¶ 26. The subsequent, unexplained sentence submitting that the sale of the company, first alleged to be part of a harassment scheme, was also "part of a plan by Worldtrak to defraud its shareholders" does not, standing alone, directly implicate Miller or, more importantly, change the nature of the allegations and the claims pleaded. With no relation to those counts actually enumerated, assuming some type of securities action based on this sole reference to stock devaluation would create a claim Hintz has not expressly alleged[2] and for which she has provided no basis or explanation, and would unreasonably construe and enlarge what is on its face an employment discrimination and sexual harassment lawsuit. The Hintz Complaint does not leave "the true nature of the claims at issue" for speculation, but precisely speci-

---

**2.** As ACE notes, there is no allusion to any of the substantive obstacles to, and procedural requirements for, bringing a shareholder derivative action or a federal securities fraud claim. *See, e.g., Skoglund v. Brady,* 541 N.W.2d 17, 21 (Minn.App.1995) (discussing limitations on shareholder derivative and di-rect actions); Fed.R.Civ.P. 9(b) (requiring fraud be pled with particularity). Additionally, Hintz requests damages for such things as loss of income, emotional and physical injury, humiliation, loss of reputation, and other pain and suffering, without mention of loss of stock value. Hintz Complaint at 8–14.

fies alleged violations of nine statutory and common laws, labeling each count accordingly. *Timmer*, 641 N.W.2d at 311; Hintz Complaint at 8–14. As such, Miller's contention that the Hintz Complaint arguably states a shareholder claim must fail.

## 2. Interpretation and Applicability of Exclusions

■ Miller submits that even without construing the Hintz Complaint to include a claim of stock devaluation, ACE's obligation to provide defense is triggered because none of the exclusions contained in the D & O Policy apply. Miller's primary argument on this issue is that the exclusions contained in the D & O Policy apply only to indemnification and not to the duty to defend. The duty to defend, Miller contends, is separately set forth in the General Terms and Conditions, which are not subject to the terms of, but apply to, all Coverage Sections offered by ACE. ACE responds that such a reading of the Policy is contrary to its clear language and purpose, improperly isolates parts of a unitary contract, and leads to an absurd result. In the alternative, Miller claims ACE cannot prove the applicability of any D & O exclusion and therefore the broad terms of the Insuring Clauses establish coverage of the Hintz action.

■ Insurance policy interpretation is a question of law and is governed by general principles of contract construction. *Progressive Specialty Ins. Co. v. Widness ex rel. Widness*, 635 N.W.2d 516, 518 (Minn. 2001). Clear, unambiguous language is given its ordinary meaning, while ambiguity is resolved against the insurer. *Id.* In construing policy provisions, "the intent of the parties is to be ascertained, not by a process of dissection in which words or phrases are isolated from their context, but rather from a process of synthesis in which the words and phrases are given a meaning in accordance with the obvious

purpose of the insurance contract as a whole." *State Farm Mut. Auto. Ins. Co. v. Tennessee Farmers Mut. Ins. Co.*, 645 N.W.2d 169, 175 (Minn.Ct.App.2002).

Here, the duty to defend must be based on and drawn from the coverage scope of the D & O Coverage Section. Miller's assertion that this duty is separately contained in the General Terms and Conditions does not square with the logical conception and reading of the Policy as a whole. Miller relies on the initial recitation of the General Terms and Conditions that "the terms and conditions of each Coverage Section apply only to that Coverage Section and shall not be construed to apply to any other Coverage Section." General Terms and Conditions ¶ A (Yetka Aff. Ex. A). He then points to the language of paragraph L that reads, "Insurer shall have the right and duty to defend any Claim ...," contending this provides a broad, overriding duty to defend that is not subject to the D & O exclusions. *Id.* ¶ L(2). The General Terms and Conditions section, however, is not a stand-alone policy. It references and expressly incorporates the "applicable Coverage Section[s]," which embody the actual insurance coverage an insured has purchased. Because Worldtrak bought only the D & O Coverage Section, the D & O Policy, as supplemented by the General Terms and Conditions, represents the entire policy at issue in this case. The General Terms and Conditions provision cited by Miller acknowledges this structure, when it states that "Item C," the Exclusions section of the D & O and other Coverage Sections, is the appropriate source of policy coverage limits:

> Costs Charges and Expenses incurred by the Insurer, or by the Insureds when defending or investigating with the written consent of the Insurer, shall be paid by Insurer as part of, and not in addition to, *Insurer's Limit of Liability set*

*forth in Item C. of the Declarations of the applicable Coverage Section.*

*Id.* (emphasis added). Thus, the Exclusions of the D & O Policy provide limitations on the defense obligations of the Insurer. *Id.*

Furthermore, Miller's argument would place the duty to defend in a vacuum. Not only would this negate the rule of determining the duty to defend by a comparison between the complaint and policy scope, with the absence of any reference to insuring clauses and limitations from which to discern arguable coverage, but would create a limitless defense obligation without relation to or regard for potential indemnification liability.[3] Such a result is contrary to any reasonable interpretation and understanding of the policy when reading these sections independently and in context, operating together to create the entire scope of coverage. *See State Farm,* 645 N.W.2d at 175. Though these provisions may not be the model of clarity, their structure and interrelation should not be dissected to result in an unreasonable meaning. *See id.; West Bend Mut. Ins. Co. v. Armstrong,* 419 N.W.2d 848, 850–51 (Minn.Ct.App.1988). The General Terms and Conditions are not a distinct policy, but supplement the various ACE policies. *See* Yetka Aff. Ex. A at A001 (Policy Declaration page listing available Coverage Sections). ACE provides them to the insured only in conjunction with one or more Coverage Sections, the documents that prescribe the substantive insurance purchased and the limits of such coverage. Accordingly, the General Terms and Conditions and the D & O Coverage Section encompass and should be read as "a whole." *State Farm,* 645 N.W.2d at 175. Thus, the duty to defend must be determined by the provisions of the D & O

Policy, the Coverage Section under which Miller was insured. It therefore must be examined whether or not any of the cited exclusions apply to the Hintz action.

Miller next asserts Insuring Clause 1 of the D & O Policy establishes arguable coverage and that ACE has not met its burden to prove that the cited exclusions clearly defeat the duty to defend. ACE acknowledges that the Insuring Clause is triggered, but argues multiple exclusions place the Hintz suit entirely outside the scope of the policy.

#### a. Employment Exclusion

ACE first asserts that exclusion (n) bars coverage because Hintz's lawsuit is based entirely on employment-related matters. This provision reads as follows:

2. Insurer shall not be liable to make any payment under this Coverage Section in connection with any Claim:

. . .

n) based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving any employment-related matters brought by or on behalf of a director, officer, or employee, including any voluntary, seasonal, temporary, leased or independent contracted employee of the company;

D & O Policy ¶ C(1)(n). Miller concedes the majority of the counts in the Hintz Complaint are based upon or arise from Hintz's employment with Worldtrak, but contends Count VII, for negligent infliction of emotional distress, and Count VIII, asserting assault and battery, do not involve employment. He further argues the entire exclusion is inapplicable because Hintz

---

**3.** Miller argues the D & O Insuring Clauses would provide applicable limitations, yet this is directly contrary to his fundamental assertion that the terms and conditions of the individual Coverage Sections do not apply to or affect the General Terms and Conditions.

was no longer an "employee" at the time of filing the lawsuit. ACE states that even if claims VII and VIII were considered to be outside of the employment context, they are explicitly precluded under another exclusion, and that the definition of "employee" includes Hintz.

Exclusion (a) exempts from coverage any claim "for actual or alleged libel, slander, defamation, bodily injury, sickness, disease, death, false imprisonment, *assault, battery,* mental anguish, *emotional distress,* invasion of privacy, or damage to or destruction of tangible property, including loss of use thereof[.]" *Id.* ¶ C(1)(a) (emphasis added). Thus, by its plain terms this clause clearly excludes Counts VII and VIII from coverage under the D & O Policy. Miller's argument that the emotional distress claim implicitly also encompasses a claim of ordinary negligence has no foundation in the language of the Hintz Complaint.

■ With respect to the definition of "employee," because exclusion (n) does not specify that it applies to former employees, Miller argues the meaning is unclear and must be interpreted in his favor to establish arguable coverage. ACE replies that the applicable definition is found in the Definitions section of the D & O Policy, which provides that "Directors and Officers" are "all persons who were, now are, or shall be: a) directors, officers or employees of the Company...." *Id.* ¶ B(5). Therefore, it submits, by virtue of this general definition, Hintz and all former employees are included in exclusion (n) as being "a director [or] officer" of the Company. *Id.* ¶ C(1)(n).

The introductory clause of the Definitions section states: "The following terms whenever used in this Coverage Section in boldface type, shall have the meaning indicated." *Id.* ¶ B. Miller maintains that since the term "employee" is not specifically defined in the policy, and the words

"director, officer or employee" in exclusion (n) are not bold-faced, "employee" takes on its ordinary meaning, which would not include former employees.

By using "director, officer, or employee" without further elaboration and without the capitalization and bold font specified in the Definitions section and found in other exclusions, exclusion (n) does not specifically incorporate these meanings and is therefore potentially open to alternative interpretation. However, this slight ambiguity "does not ineluctably lead to the conclusion that the drafter is to lose." *Davis v. Outboard Marine Corp.,* 415 N.W.2d 719, 724 (Minn.App.1987); *see also Horizon III Real Estate v. Hartford Fire Ins. Co.,* 186 F.Supp.2d 1000, 1004 (D.Minn.2002). When readily discernable, the parties intent and the "obvious purpose of the contract as a whole" must govern. *Davis,* 415 N.W.2d at 723 (internal alteration and quotation omitted); *see also State Farm,* 645 N.W.2d 169, 175.

ACE states that the applicability of the employment exclusion to claims by former employees is evidenced by the availability of another ACE policy, the Employment Practices Liability ("EPL") insurance, which Worldtrak was offered but declined to purchase for economic reasons. Since the EPL Coverage Section provides coverage for employment suits, most of which are brought by former employees, ACE contends construing "employee" as only current employees would subvert the purpose of the employment exclusion: to exempt from D & O coverage those claims encompassed by the EPL insurance. ACE argues that by buying only the D & O Policy, intended to cover shareholder and third-party claims, Worldtrak and Miller could not have reasonably expected to obtain the employment-related coverage offered by the EPL Policy they elected not to purchase.

The expansive language of exclusion (n) indicates an intent to exclude from coverage claims based in any way on a plaintiff's employment relationship with the employing company. *Cf. Meadowbrook,* 559 N.W.2d at 419–20 (discussing breadth of employment exclusion). The existence and offering of the separate EPL Policy further supports the notion that the parties would not reasonably expect the D & O Policy to extend to employment-based actions, such as that brought by Hintz. Denying coverage for claims by employees who sue while still employed with the company, while providing it for those brought by employees who have resigned or been fired, would draw an artificial and impractical distinction that would greatly hinder the purpose of exempting employment-related suits from D & O coverage. Exclusions function to restrict coverage obligations for activity not within the subject matter of the policy, such that "[e]xclusions typically found in D & O policies preclude coverage of matters that may be covered by other insurance. For instance, the [D & O] policy will not provide coverage for claims arising from pollution incidents, ... accidents falling under the workers' compensation laws, and *employment practices.*" Kalberman, Stacey, *Director and Officer Liability: An Overview of Corporate and Insurance Indemnification,* 7 No. 4 Andrews Sec. Litig. & Reg. Rep. 17 (2001) (emphasis added).

Though not specifically including "former" employees, exclusion (n) should be read to apply to the Hintz lawsuit, which, though initiated after she was terminated, concededly arose from her employment at Worldtrak. However, even accepting Miller's interpretation and restricting the exclusion to claims of present employees, subsection C(1)(f), the "Insured v. Insured" clause, places the Hintz action beyond the scope of the policy.

### b. Insured v. Insured Exclusion

■ ACE additionally proffers exclusion (f) as proof that the Hintz action falls clearly outside the policy coverage. This provision negates ACE's liability obligations for claims by, on behalf [of], or at the direction of any of the Insureds, except and to the extent such claim:

(i) is brought derivatively by a security holder of the Company who, when such claim is first made, is acting independently of all of the Insureds, ... or

(iii) is brought by an employee of the Company who is not or was not a director or officer of the Company and where such Claim is brought by such employee only in their capacity as a security holder of the Company[.]

D & O Policy ¶ C(1)(f). "Insured" means "the Company and the Directors and Officers" and, as previously cited, "Directors and Officers" are defined as "all persons who were, now are, or shall be:

a) directors, officers, or employees of the Company, and

b) the functional equivalent to directors or officers of the Company in the event the Company is incorporated or domiciled outside the United States...."

*Id.* ¶ B(1), (5). Therefore, "Insureds" include former employees of Worldtrak. As such, Hintz is an "Insured" and her suit is excluded unless one of the exceptions recited above applies.

Despite this definition, Miller asserts "Insureds," and therefore, this exclusion, should not be read to include all employees but only those acting as "the functional equivalent" of directors and officers. Pl.'s Reply Mem. at 16. The plain language of the relevant definitions belies this argument. Though courts have interpreted

"insured v. insured" clauses narrowly in certain circumstances, where such exclusions are clear and susceptible to only one fair interpretation, courts generally apply them pursuant to their plain terms. *Compare Conklin Co. v. National Union Fire Ins. Co.,* No. 4–86–860, 1987 WL 108957, 1987 U.S. Dist. LEXIS 12337, at *7–8 (D.Minn. Jan. 28, 1987) (finding insured v. insured exclusion ambiguous and thus inapplicable, in light of underlying purpose of clause); *with Foster v. Kentucky Hous. Corp.,* 850 F.Supp. 558, 561 (E.D.Ky.1994) (applying unambiguous insured v. insured clause and "directors and officers" definition that included former employees without inquiry into collusive potential of lawsuit) *and FDIC v. Zaborac,* 773 F.Supp. 137, 143 (C.D.Ill.1991) (noting that "[b]efore a court can start divining the intent behind [an insured v. insured] clause, the Court must determine that the clause was ambiguous").

Miller relies on *Conklin* and a related authority, *Township of Center v. First Mercury Syndicate, Inc.,* 117 F.3d 115, 119 (3d Cir.1997), asserting that the purpose of insured v. insured provisions is the prevention of collusive lawsuits and therefore the court should evaluate the legitimacy of the underlying action in determining whether to apply this type of exclusion. While this position finds some support in decisions involving insured v. insured clauses, where policy language is explicit and unambiguous, the court may not create ambiguity to afford coverage. *General Mills, Inc. v. Gold Medal Ins. Co.,* 622 N.W.2d 147, 151 (Minn.Ct.App.2001); *see also Noran Neurological Clinic, P.A. v. Traveler's Indem. Co.,* 229 F.3d 707, 709 (8th Cir.2000) (noting duty of interpreting courts to "fastidiously guard against the invitation to create ambiguities where none exist") (quoting *Columbia Heights Motors, Inc. v. Allstate Ins. Co.,* 275 N.W.2d 32, 36 (Minn.1979)). Accordingly, the Court may not insert Miller's suggested modification into the unam-

biguous Policy definitions, under which Hintz, as a former employee, is explicitly defined as an "Insured."

Miller next contends that even if Hintz is an "Insured," both exceptions (i) and (iii) provide arguable coverage. Her action, he argues, may be viewed as a shareholder suit and thus exempted from the exclusion. Miller, however, offers no evidence to support this assertion and thus cannot meet his burden to establish the applicability of these exceptions. *See Smith v. State Farm Fire & Cas. Co.,* 656 N.W.2d 432, 436 (Minn.Ct.App.2003) (citing rule that insured bears burden of proving exceptions to exclusions). The Hintz suit is not a derivative action brought in the name of the corporation, ruling out exception (i), and because, as discussed above, Hintz has sued Worldtrak, Dircz, and Miller for alleged violations of employment and tort laws, she has not brought her claims "only in [her] capacity as a security holder of the Company." D & O Policy ¶ C(1)(f)(iii); *see supra* part IIIB(1) (construing claims of Hintz Complaint). The insured v. insured exclusion therefore precludes coverage of the action and ACE is entitled to summary judgment on the declaratory judgment and breach of contract claims because it has no potential duty to indemnify and therefore no duty to defend.

## C. ACE's CROSS MOTION

ACE additionally moves for summary judgment on Miller's claims of breach of the duty of good faith and fair dealing and breach of fiduciary duty, arguing that, as a matter of Minnesota law, ACE cannot be liable under these theories because it has not undertaken defense of the claims against Miller. Prior to the insurer assuming defense of the insured, ACE asserts, there can be no fiduciary duty to conduct the defense in good faith and thus no breach of such a duty. It further avers

that under Minnesota law, an insured may not seek tort damages for a breach of contract. Miller counters that the Minnesota courts have established a duty of the insurer to act in good faith throughout the term of the contractual relationship.

### 1. Breach of Good Faith and Fair Dealing

■ ACE correctly recites that an alleged bad-faith breach of contract cannot be the basis for tort liability under Minnesota law. *See Haagenson v. Nat'l Farmers Union Prop. and Cas. Co.*, 277 N.W.2d 648, 652 (Minn.1979). However, a claim for breach of the covenant of good faith and fair dealing is not grounded in tort, but contract, such that an insured may assert a breach of the covenant of good faith and fair dealing in conjunction with a breach of contract claim. *In re Silicone*, 652 N.W.2d at 54, 75. However, in this case, summary judgment is nonetheless appropriate because Miller bases his claim for breach of the duty of good faith and fair dealing on the same facts he asserts to support the breach of contract claims, namely, ACE's refusal to provide defense and indemnification in the Hintz action. *See Midwest Sports Mktg. v. Hillerich & Bradsby of Can.*, 552 N.W.2d 254, 268 (Minn.App.1996) (granting summary judgment on covenant of good faith and fair dealing claim where same facts alleged as basis for other non-viable contract claims). Because ACE did not breach these contractual duties and no further allegations or evidence have been presented to show how ACE "unjustifiably hinder[ed]" Miller's performance of the contract, summary judgment on this count is granted. *In re Hennepin County 1986 Recycling Bond Litig.*, 540 N.W.2d 494, 502 (Minn. 1995).

### 2. Breach of Fiduciary Duty

■ Count V of Miller's Complaint asserts ACE breached the fiduciary relationship between insured and insurer. ACE maintains that this claim does not state a cause of action recognized in Minnesota and is therefore ripe for summary judgment.

To substantiate this claim, Miller relies on *Kissoondath v. United States Fire Ins. Co.*, 620 N.W.2d 909 (Minn.Ct.App.2001), in which the Minnesota Court of Appeals expressed "that an insurer owes its insured a fiduciary duty to represent the insured's best interests." *Id.* at 915. In so holding, however, the Appeals Court was not creating a new rule of law, but was reiterating the ruling of an earlier Minnesota Supreme Court decision, *Short v. Dairyland Ins. Co.*, 334 N.W.2d 384 (Minn. 1983). The *Kissoondath* court clarified, in reversing the district court, that the statements in *Short* regarding the fiduciary duty of the insurer were expressions of opinion and not mere dicta. *Kissoondath*, 620 N.W.2d at 915. Accordingly, the parameters of the duty established in *Short* provide the authority for this claim.

In *Short*, the Court found the insurer failed to exercise good faith in settlement negotiations with a third party to whom the insured was clearly liable, when it refused to settle within the policy limits. *Short*, 334 N.W.2d at 388. Explaining the relationship and the resultant duty between the insurer and insured in such situations, the Court stated that when "the insurer contractually acquires control of the negotiations and settlement," there are often "conflicting interests on the part of the insurer. On the one hand, the insurer owes a fiduciary duty to the insured to represent his or her best interests and to defend and indemnify. On the other hand, the insurer is interested in settlement at the lowest possible figure." *Id.* at 387. The right of the insurer to control settlement negotiations, the Court concluded, "must be subordinated to the purpose of

the insurance contract-to defend and indemnify the insured within the limits of the insurance contract." *Id.* The Court then explained the terms of the insurer's fiduciary duty, holding that

> [i]n Minnesota, a liability insurer, *having assumed control of the right of settlement of claims against its insured,* may become liable in excess of its undertaking under the terms of the policy if it fails to exercise 'good faith' in considering offers to compromise the claim for an amount within policy limits. This duty to exercise 'good faith' includes an obligation to view the situation as if there were no policy limits applicable to the claim, and to give equal consideration to the financial exposure of the insured.

*Id.* at 387–88 (internal citations omitted, emphasis added).

Thus, the rule enunciated in *Short* and referenced in *Kissoondath,* specifies the fiduciary obligations as arising once the insurer assumes the defense of the insured. *See Short,* 334 N.W.2d at 387–88; *Kissoondath,* 620 N.W.2d at 913, 916.[4] Where the insurer is not yet acting as advocate for the insured in dealing with a third party, the conflict of interest inherent in settlement negotiations and creating the fiduciary duty is not at issue. Miller cites no authority expressly providing for a fiduciary duty before this time, and Minnesota law is established that an alleged bad-faith breach of contract does not support extra-contractual liability absent an independent tort. *Haagenson,* 277 N.W.2d at 652; *In re Silicone,* 652 N.W.2d at 74. In accordance with the foregoing, summary judgment is granted as to Miller's fiduciary duty claim, Count V of the Complaint.

## IV. CONCLUSION

Based on the foregoing, and all the files, records and proceedings herein, **IT IS HEREBY ORDERED** that:

1. Defendant's Motion for Summary Judgment [Docket Nos. 8, 14] is **GRANTED,**

2. Plaintiff's Motion for Partial Summary Judgment [Docket No. 10] is **DENIED,** and

3. Plaintiff's Complaint [Docket No. 1] is **DISMISSED WITH PREJUDICE.**

---

4. This point is highlighted by the many cases that cite *Short* for Minnesota's recognition of a "bad faith" cause of action for an insurer's failure to settle within policy limits. *E.g., In re Mathews,* 207 B.R. 631, 636–37 (Bankr. D.Minn.1997); *see also Pillsbury Co. v. National Union Fire Ins. Co. of Pittsburg, Pa.,* 425 N.W.2d 244, 249 (Minn.Ct.App.1988). These opinions, reciting the proposition that a duty of good faith arises in *settlement negotiations,* necessarily implicate fact scenarios in which the insurer had undertaken the defense and was involved in potential settlement of the action against the insured. *See, e.g., Northfield Ins. Co. v. St. Paul Surplus Lines Ins. Co.,* 545 N.W.2d 57, 60 (Minn.Ct.App. 1996) (finding insurer did not breach *Short* duty when refusing to consider settlement offer because insured was not clearly liable). Thus, Miller's reliance on the broad language in *Kissoondath,* which arguably implies a general fiduciary duty to insureds from the inception of the contractual relationship, is not supported by the rule of *Short,* on which the *Kissoondath* holding was explicitly based. *See Kissoondath,* 620 N.W.2d at 914–15. Although references to "fiduciary duty" and "good faith" are intermingled in both *Kissoondath* and *Short,* the *Kissoondath* decision holds to the *Short* edict that the "good faith" standard by which an insured's fiduciary duty is judged operates within the settlement context, such that it is "breached when the insured is clearly liable ... and *when the insurer's refusal 'to settle* within the policy limits is not made in good faith and is not based upon reasonable grounds to believe that the amount demanded is excessive.'" *Kissoondath,* 620 N.W.2d at 916 (quoting *Short,* emphasis added). Furthermore, like *Short,* the *Kissoondath* decision addressed the actions of the insurer that occurred after it had undertaken defense of, and settlement negotiations for, the insured. *Id.* at 913.

LET JUDGMENT BE ENTERED AC-
CORDINGLY.