**Brian P. SHORT, as Trustee in Bankruptcy for Gerald D. Kearney, Respondent,**

v.

**DAIRYLAND INSURANCE COMPANY, Appellant.**

No. C7–82–1330.

Supreme Court of Minnesota.

May 27, 1983.

Robins, Zelle, Larson & Kaplan, Terence R. Joy, Robert M. Wattson, Minneapolis, for appellant.

DeParcq, Anderson, Perl, Hunegs & Rudquist, and Richard G. Hunegs and Peter W. Riley and Michael L. Weiner, Austin, Roth, Sunde, McDonough & Tierney, and Robert M. Austin, Minneapolis, for respondent.

YETKA, Justice.

Appellant was ordered by the Hennepin County District Court, the Honorable Jonathan Lebedoff, to pay respondent $720,000 plus interest in an action arising out of appellant's bad faith conduct towards its insured. The court ordered summary judgment in favor of respondent.[1] We affirm and adopt the appended Memorandum by Judge Lebedoff as our opinion.

Affirmed.

COYNE, J., took no part in the consideration or decision of this matter.

### APPENDIX
JONATHAN LEBEDOFF, Judge.

This matter is before the Court upon cross-motions for summary judgment. This action is predicated on the claim of Brian P. Short, as trustee in bankruptcy, for Gerald D. Kearney [Kearney] against the Dairyland Insurance Company [Dairyland]. The plaintiff seeks actual and punitive damages based upon the alleged bad faith of Dairyland.

On February 23, 1976, Kearney was involved in a two-car collision in Hennepin County. The driver of the other car, Donald Morin, died at the scene of the accident as a result of the injuries he sustained. At the time of his death, Morin was forty years of age, earned an annual income of approximately $30,000.00, and was survived by a wife and five minor children.

At the time of the accident, Kearney was insured by Dairyland under a policy providing bodily injury liability coverage with limits of $25,000.00 per person. The deceased's vehicle was insured under a no-fault policy issued by State Farm Insurance Company [State Farm].

On March 1, 1976, Kenneth Sipe, Kearney's "step-father," [1] notified Dairyland of the accident. Initial reports of the accident, including police reports, indicated that

---

1. Respondent's motion was for partial summary judgment. Judge Lebedoff, however, informed the parties that he intended his order to be a full and final disposition of the case and it has been so treated.

1. Sipe was married to Kearney's mother when Kearney was still a child. No formal adoption was ever commenced. Thus, Sipe was not actually in the position of step-father, legally, but was considered by Kearney and himself to be such.

Kearney had crossed over the centerline and struck Morin's auto. Preliminary reports also indicated that Kearney was operating his vehicle with a blood/alcohol concentration in excess of .10. A file was opened by Dairyland, and it was assigned to one of its claims examiners, Linda Lunzer, who maintained a written log of her activities vis-a-vis the Kearney file. On March 2, Lunzer retained Town and Country Adjusting Service to investigate the accident. Also on March 2, Lunzer learned from the Medina police chief that criminal negligence charges were likely to be filed against Kearney.

On March 3, Lunzer learned from Town and Country that the Minnesota State Highway Patrol had informed Mrs. Morin that her husband had not been at fault. She also was informed that Morin's brother wanted to settle, pending his receipt of a certified copy of the insurance policy. Lunzer's notes also indicate that a decision had been made to attempt to settle the case after an investigation had been completed. It appears that the investigator was unable to interview Kearney due to the injuries he had received in the accident. By March 18, Lunzer had been informed by Kearney's wife and "step-father" that Kearney could recall nothing about the accident, and that he had failed to take his prescribed "anti-blackout" medication. One day later, March 19, Lunzer was informed by the decedent's wife that she had retained an attorney. On March 22, Lunzer received a retainer letter from Richard Theno, an investigator with the DeParcq law firm, requesting that all further communications be directed to the law firm.

On March 24, Lunzer's investigator was finally able to speak with Kearney and learned that he recalled absolutely nothing about the accident, although he did deny having more than one drink before driving home. This information was relayed to Lunzer on the same day. Also on the 24th, Lunzer spoke with Theno who informed her that they wanted the $25,000.00 policy limit to settle. Lunzer informed Theno that she still wanted to interview the police officers, and for the first time raised the subrogation problem should the DeParcq firm commence suit.[2] On the 25th, Kearney himself telephoned Lunzer and told her that he suffered from blackouts, that he had failed to take the medication on the day of his accident, and that he had, in fact, blacked out.

On March 30th, Lunzer learned that Kearney had been charged with criminal negligence as a result of his blood/alcohol concentration reading after the accident. Also on that date, Lunzer reviewed the Kearney file with her claims manager, Wilson Graham, and it was decided no additional investigation was necessary, and Lunzer was given the authority to settle the suit. Lunzer deposition at p. 72.

The next day, March 31, Norman Perl, a senior partner at the DeParcq law firm, contacted Lunzer. According to Lunzer's log, Perl informed her that he would not settle for less than the full policy limit and "brought up bad faith." According to Perl's deposition testimony, Lunzer requested a discount to be deducted from the policy limit. Perl deposition at p. 35. According to his testimony, he told her to pay the full policy limit "now" or it would be put into suit. Lunzer allegedly infomred [informed] Perl that should the matter be placed in suit, the subrogation rights of State Farm would deprive the Morins of the "money anyway so she should get the benefit of it." Perl deposition at p. 35. According to Perl, Lun-

**2.** Minnesota Statutes section 65B.51, subdivision 1 reads, in part:

This subdivision shall not bar subrogation and indemnity recoveries under section 65B.53, subdivisions 1 and 2, if the injury had the consequences described in subdivision 3 *and a civil action has been commenced* in the manner prescribed in applicable laws or rules of civil procedure to recover damages for noneconomic detriment. (emphasis added).

Thus, the subrogation rights of State Farm would only become extant after the commencement of suit. *See* Steenson, *Subrogation and Indemnity Rights Under the Minnesota No-Fault Automobile Insurance Act,* 4 Wm. Mitchell L.Rev. 119, 136–137 (1978).

The above-quoted sentence was eliminated from the statute in 1977. *See* Act of May 25, 1977, ch. 266, § 4, 1977 Minn.Laws 438.

zer informed him that she did have the authority to settle. Lunzer's log merely indicates that she would "see what [she] could do." On April 6, suit was commenced by service of Summons and Complaint upon Kearney. After April 6, negotiations between Lunzer and Perl achieved little in the way of progress. Lunzer would only agree to settle for $25,000.00 with State Farm named on the check, or for $24,000.00 without State Farm named on the check, provided that the lawsuit was dismissed. Perl demanded the full policy limits or an Answer to his Summons and Complaint. Dairyland retained an attorney to represent Kearney, and an Answer was served and filed on behalf of the insured.

On June 17, 1977, over one year later, an attorney at the DeParcq firm, J. Egan, wrote to the insured's attorney once again informing him that they were willing to settle for $25,000.00 without State Farm being named on the draft. Egan set forth his views as to why State Farm had no valid subrogation interest, and advised that the offer would remain open for fourteen days. He also suggested that should the matter go to trial, it was very likely that a jury verdict would far exceed the limits of the policy. It does not appear that Dairyland ever responded to this renewed offer, which was withdrawn after fourteen days.

On December 1, 1977, Dairyland attempted, by motion, to deposit the policy limits into Court. Counsel for the Morins, however, objected to Dairyland's motion, citing Dairyland's earlier refusals to respond to their good faith settlement attempts. Dairyland's motion was denied.

On October 11, 1978, two weeks prior to trial, Dairyland offered the policy limits without conditioning the offer upon State Farm being named on the check. This offer was refused. The matter proceeded to trial, and a jury verdict was rendered against Kearney in the amount of $745,000.00. Although Kearney's attorney, retained by Dairyland, moved the Court for a new trial, or, in the alternative, for a remittitur to the jury verdict, he never sought to appeal the Court's denial of his post-trial motions, or the jury verdict.

Due to the excess judgment against Kearney, he subsequently filed for bankruptcy through his attorney, the same attorney retained by Dairyland. Kearney was adjudged bankrupt, a trustee was appointed, and this suit was commenced against Dairyland alleging bad faith and seeking the excess damages plus interest and punitive damages. Only the issue of the excess damages is before this Court.

Given the uncontroverted facts presently before this Court, the issue which must be addressed is whether Dairyland acted in good faith and upon reasonable grounds in rejecting the settlement offer proposed by Morin's attorney. This Court is of the opinion that it did not.

■ The primary right of a purchaser of a contract of insurance is the right to payment when a loss signals the insurer's liability within the limits of the policy of insurance. Keeton, *Ancillary Rights of the Insured Against His Liability Insurer,* 13 Vand.L.Rev. 837, 837 (1960). Usually, however, the insurer contractually acquires control of the negotiations and settlement, thus oftentimes creating conflicting interests on the part of the insurer. On the one hand, the insurer owes a fiduciary duty to the insured to represent his or her best interests and to defend and indemnify. On the other hand, the insurer is interested in settlement at the lowest possible figure. It is important, however, and must be remembered, that the insurer's right to control the negotiations for settlement must be subordinated to the purpose of the insurance contract—to defend and indemnify the insured within the limits of the insurance contract.

■ In Minnesota, a liability insurer, having assumed control of the right of settlement of claims against its insured, may become liable in excess of its undertaking under the terms of the policy if it fails to exercise "good faith" in considering offers to compromise the claim for an amount within the policy limits. *Lange v. Fidelity & Casualty Co.,* 290 Minn. 61, 185 N.W.2d 881 (1971); *Larson v. Anchor Casualty Co.,* 249 Minn. 339, 82 N.W.2d 376 (1957). This duty to exercise "good faith" includes an obligation to view the situation as if there

were no policy limits applicable to the claim, and to give equal consideration to the financial exposure of the insured. *Continental Casualty Co. v. Reserve Ins. Co.,* 307 Minn. 5, 238 N.W.2d 862 (1976).

The insurer's duty of good faith is breached in situations in which the insured is clearly liable and the insurer refuses to settle within the policy limits and the decision not to settle within the policy limits is not made in good faith and is not based upon reasonable grounds to believe that the amount demanded is excessive. *See Peterson v. American Family Mut. Ins. Co.,* 280 Minn. 482, 486, 160 N.W.2d 541, 543–44 (1968); *Boerger v. American Gen. Ins. Co.,* 257 Minn. 72, 74–75, 100 N.W.2d 133, 135 (1959).

In *Boerger v. American General Insurance Company,* 257 Minn. 72, 100 N.W.2d 133 (1959), the Minnesota Supreme Court addressed itself to the same issue as presented in the instant case, i.e. whether the insurer acted in good faith and upon reasonable grounds in rejecting a proposed settlement offer. In this regard, the court stated:

> We are of the opinion that the insurance company could have validly declined the offer of settlement if good faith existed on either of two grounds. First, if it in good faith believed that its insured was not liable. Second, even if liability of its insured was certain, if it believed in good faith that a settlement at the proposed figure which it was required to contribute was greater than the amount the jury would award as damages.

*Id.* at 75, 100 N.W.2d at 135.

In the instant case, there can be no doubt whatsoever that Dairyland failed with regard to both grounds. First, Dairyland does not contend, nor could it, that its insured was not liable. Dairyland knew, or had reason to know, that its insured had crossed the centerline and struck the deceased's vehicle. Moreover, Dairyland knew, or should have known, that its insured had been operating his motor vehicle with a blood/alcohol concentration in excess of .10. All of this information was in the possession of Dairyland as early as March 2, one day after receiving an initial report of the accident. It is beyond comprehension to hold that Dairyland had a "good faith" belief that its insured was even arguably without liability. While it is understandable that Dairyland may have desired additional time within which to interview its insured and the police officers who had been present at the scene of the accident, all of this was completed by March 30 when Lunzer's supervisor gave her the authority to settle the case. If anything, this grant of authority is evidence of Dairyland's conclusion that its insured was, indeed, at fault.

Second, there can be little doubt that Dairyland could not, in good faith, realistically entertain the belief that the $25,000.00 policy limit was greater than a jury would award. Although it is often difficult for anyone to accurately evaluate a possible jury award, it is inconceivable that Dairyland could believe that any jury would award less than $25,000.00 to the widow and five minor children of a forty-year-old breadwinner earning $30,000.00 annually who was struck and killed by someone who had crossed the centerline and who had been driving under the influence of alcohol.

Dairyland complains that it was under no absolute duty to accept the settlement demand of March 31, and that it was entitled to "explore" the possibility of settlement for less than the full policy limits. While this may be true, such "exploration" might lead to a finding of bad faith, and in the instant case, that it was [what] this Court has found. To characterize Dairyland's brazen attempts to obtain a discount as "exploring" the possibility of settlement for less than the full policy limits is specious and overlooks Dairyland's primary responsibility—its insured. Not only did Dairyland attempt to obtain a discount, but also attempted to coerce Morin's attorney into submission by raising the spectre of State Farm's subrogation rights should Morin seek to submit her claim to the jurisdiction of the courts. If such actions do not constitute lack of "good faith," this Court is unable to imagine why. Lunzer's reference to State Farm's subrogation right should

the matter be placed into suit could be nothing more than an attempt to gain leverage and a discount from the policy limits—all in dereliction of its fiduciary duty to Kearney.

Further evidence of Dairyland's lack of good faith is exhibited by their failure to ever apprise its insured of Morin's settlement offer or their "counter-offer." In a determination of good faith, "an important question is whether the insurer informed the insured of all proceedings, *including communication of settlement offers.*" *New Amsterdam Casualty Co. v. Lundquist,* 293 Minn. 274, 286–87, 198 N.W.2d 543, 551 (1972) (citing *Larson v. Anchor Casualty Co.,* 249 Minn. 339, 352, 82 N.W.2d 376, 384 (1957)) (emphasis added). It is uncontroverted that Dairyland failed in this regard, thus further evidencing their lack of good faith.

Dairyland contends that the March 31 settlement demand became impossible to accept by virtue of commencement of suit by Morin. Essentially it is their contention that after the commencement of suit, State Farm's subrogation rights arose, and that it was Dairyland's responsibility to enforce those rights.[3]

Aside from the fact that commencement of suit on behalf of the decedent's survivors may have been the only recourse in light of Dairyland's seemingly intractable position in refusing to settle without a discount, this contention flies in the face of Dairyland's October 11, 1978 offer to pay the full policy limits without naming State Farm on the check. If Dairyland felt that they could make the offer in October of 1978, why could they not have made the offer in 1976? Dairyland has not advanced any rationale for this change in position.

**3.** This Court is of the opinion that Dairyland's construction of the statute is incorrect. Minnesota Statutes section 65B.53, subd. 2 stated that "[t]his right of subrogation exists only to the extent that recovery on the claim absent subrogation would produce a duplication of benefits or reimbursement of the same loss." Thus, under the terms of the statute, even had Dairyland paid the full policy limits—$25,-000.00—State Farm's subrogation right would not have come into existence unless, or until,

Dairyland's citation to *Coe v. State Farm Mut. Automobile Ins. Co.,* 66 Cal.App.3d 981, 136 Cal.Rptr. 331 (Cal.Ct.App.1977), is meritless. In *Coe,* the Court noted that the express terms of the statute required that the third-party, the State Compensation Insurance Fund, give written consent to settlement. *Id.; see* Cal.Lab.Code §§ 3859, 3860, subd. a (West 1976). As such, the case is clearly distinguishable.

For all of the foregoing reasons, plaintiff's motion for partial summary judgment is granted. The amount of damages is the excess amount over and above the $25,-000.00 policy limits. *See Strand v. Travelers Ins. Co.,* 300 Minn. 311, 219 N.W.2d 622 (1974) (per curiam).

such payment produced a double recovery. [The language quoted here was enacted in March 1976. Act of March 25, 1976, ch. 79, § 1, 1976 Minn.Laws 201, 202. Minn.Stat. § 65B.53, subd. 2 (1974), in effect at the time of Kearney's accident, made no reference to full compensation of the victim as a precondition to subrogation. This error, however, affects neither the validity of Judge Lebedoff's result nor the accuracy of the rest of his memorandum.]