**CHRISTIAN BUILDERS, INC.,
a Minnesota corporation,
Plaintiff,**

v.

**The CINCINNATI INSURANCE
COMPANY, an Ohio corporation, Defendant.**

**No. 05–CV–2795 (PJS/RLE).**

United States District Court,
D. Minnesota.

Aug. 14, 2007.

---

Steven P. Zabel, Leonard Street & Deinard, PA, for plaintiff.

Cheryl L. Hanson and William L. Moran, Murnane Brandt, PA, for defendant.

## ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

SCHILTZ, District Judge.

Plaintiff Christian Builders, Inc. ("CB") brings this insurance bad-faith action against defendant The Cincinnati Insurance Company ("Cincinnati"), alleging that Cincinnati did not act in good faith when it failed to settle a wrongful-death lawsuit against CB. This matter is before the Court on Cincinnati's motion for summary judgment. For the reasons set forth below, Cincinnati's motion is granted, and CB's complaint is dismissed.

## I. BACKGROUND

The facts in this case are largely undisputed.[1] CB is a construction company founded by Charles Christian ("Charles"). During the relevant time period, Charles also had an interest in a corporation called EZ Rolloff, which manufactured trailers. C. Christian Dep. 31. On May 17, 2001, Charles's brother David was driving a CB vehicle to which he had hitched an EZ Rolloff trailer. The trailer was loaded with wooden pallets. While David was driving, a pallet fell off the trailer and struck Brian Smith, who was riding a motorcycle. Smith died as a result of his injuries.

At the time of the accident, Cincinnati provided a total of $2 million in insurance coverage to CB—$1 million under a business-auto policy, and $1 million under an excess-liability policy. C. Christian Aff. Exs. 1, 2. CB notified Cincinnati of the accident in May 2001. Dugan Dep. 20. Richard Dugan was Cincinnati's claim supervisor assigned to the case until February 2003, when Jack Victory took over supervision of the claim. Dugan Dep. 55. Shortly after receiving notice of the claim, Cincinnati hired Minneapolis attorney Rolf Sonnesyn to represent CB. Dugan Dep. 23; Sonnesyn Dep. 10–11. Cincinnati had hired Sonnesyn to work on approximately 80 other cases before it retained him on CB's behalf. Sonnesyn Dep. 12.

---

1. For the record, the Court notes that there is a gap in CB's evidentiary submissions. The October 18, 2006 affidavit of Steven P. Zabel states that excerpts from the depositions of Charles Christian, Jack Victory, and John Sheehy are attached as exhibits 3, 4, and 5, respectively, but these attachments are not in the Court's electronic case file, nor were courtesy copies submitted to the Court.

In September 2001, Smith's mother, Bonnie Olson, brought a wrongful-death suit against CB, EZ Rolloff, and David Christian in Minnesota state court. Hanson Aff. Ex. B.[2] Sonnesyn's initial estimate of the settlement value of the case was $300,000, which he considered to be substantial. Sonnesyn Dep. 20–21; Hanson Aff. Ex. F. In arriving at this figure, Sonnesyn took into account a number of factors, including the following:

- CB was probably liable, but David's actions were negligent or careless, rather than reckless or intentional, and thus David's conduct was unlikely to inflame a jury.
- David was a nice man who would probably make a sympathetic appearance as a witness. Nothing about David was likely to inflame a jury.
- Smith was driving a motorcycle, which some jurors might consider inherently dangerous, and which therefore might have a dampening effect on the verdict.
- Smith was an unmarried 22–year–old high-school dropout who had no dependents, who did not provide financial support to anyone, and who, at the time of his death, was still living at home with his mother.
- There were no economic losses other than relatively small medical bills and the funeral bill.

Sonnesyn Dep. 21–22, 32.

At the time he was hired to defend the Olson case, Sonnesyn had handled roughly 100 wrongful-death suits, including trying ten wrongful-death cases to a verdict. Sonnesyn Dep. 8. All of the ten wrongful-

death cases Sonnesyn tried resulted in either a finding of no liability or an award of damages of less than $1 million. Sonnesyn Dep. 9.

In a February 28, 2002 letter to Dugan, Sonnesyn opined that the probable *verdict* range of the case was $150,000 to $500,000, well within the $2 million policy limits. Hanson Aff. Ex. F. Sonnesyn also advised Dugan that, despite Sonnesyn's attempt to develop a defense of comparative fault, there was no solid legal or factual basis for such a defense. Hanson Aff. Ex. F. As a result, Sonnesyn said, the case should be treated as one in which there was probable liability with no comparative fault. Hanson Aff. Ex. F.

As discovery progressed, Sonnesyn revised his evaluation of the case. After taking the depositions of Smith's family members, Sonnesyn raised his estimate of the settlement value to $400,000 because he thought the family members made effective witnesses. Sonnesyn Dep. 22, 32. At some point in 2002, Sonnesyn advised Cincinnati that the probable verdict range was $250,000 to $750,000, still well within the $2 million policy limits. Hanson Aff. Ex. G. Shortly before the parties' January 2003 mediation, Cincinnati asked Sonnesyn to conduct a round-table discussion of the case with other attorneys at his firm. Sonnesyn Dep. 26–27. Based on their independent evaluation of the case, the participants estimated that the settlement range was between $400,000 and $600,000.[3] Victory Dep. 21; Sonnesyn Dep. 135–36.

The parties attended a mediation on January 14, 2003. Sonnesyn Dep. 27. Darren Envall, the Cincinnati field repre-

---

**2.** The initial complaint was filed in August 2001. The following month, Olson amended her complaint to add EZ Rolloff as a defendant. Hanson Aff. Ex. B.

**3.** Cincinnati characterizes this range as a settlement range. Def.'s Mem. Supp. Summ. J.

4. But in his deposition, Victory discusses this range as a verdict range, Victory Dep. 22, and the record is not entirely clear either way. Because Cincinnati's characterization is more favorable to CB, the Court will assume that it is correct.

sentative involved in the case, also attended the mediation, as did Charles and David. Dugan Dep. 28, 33; Sonnesyn Dep. 44, 48. Dugan did not attend the mediation. Dugan Dep. 34. Cincinnati gave Sonnesyn settlement authority of $400,000, which matched Sonnesyn's estimate of the settlement value of the case, and which was within the range recommended by the attorneys in his firm after the round-table. Sonnesyn Dep. 35–36.

The mediation began with a demand from John Sheehy, Olson's counsel, for the entire $2 million in policy limits. Sonnesyn Dep. 38. Sonnesyn countered with an offer of $250,000. Sonnesyn Dep. 38. Sheehy rejected the offer and again demanded $2 million. Sonnesyn Dep. 42. Although the participants' recollections at this point become a bit hazy, there is no dispute that eventually both Sonnesyn and Charles spoke to Dugan on the telephone. Sonnesyn Dep. 47–48; Dugan Dep. 37–39. Charles asked that the offer be increased. Dugan Dep. 39. Dugan instructed Sonne-

syn to offer $500,000. Sonnesyn Dep. 47, 49. Sheehy again rejected the offer and again refused to budge off his $2 million demand. Sonnesyn Dep. 50. At some point, Charles told Sonnesyn that "he had to get over a million dollars to even keep talking." [4] C. Christian Dep. 76. According to Sonnesyn, he relayed this request to Cincinnati, but advised Cincinnati that he thought the case had been evaluated correctly. Sonnesyn Dep. 52. Dugan agreed and did not grant additional settlement authority. Sonnesyn Dep. 52. (Dugan apparently has no recollection of this conversation. Dugan Dep. 40.) Again, at this point Sonnesyn had estimated the settlement value of the case as $400,000; Sonnesyn's partners had estimated it at $400,000 to $600,000; Cincinnati had offered $500,000; and Sheehy was demanding $2 million.

The mediation ended at an impasse. Based on what he had seen, and based on what the mediator told him, [5] Sonnesyn concluded that Sheehy would not move off

---

**4.** CB contends that Charles made this statement directly to Dugan, but Charles's deposition testimony makes it clear that he was speaking to Sonnesyn at the time. C. Christian Dep. 76–77.

**5.** Cincinnati argues that evidence that the mediator told Sonnesyn that Sheehy was unlikely to accept less than $2 million is inadmissible under Minn.Stat. § 595.02, subd. 1a. Pl.'s Resp. Mem. Def.'s Mot. Summ. J. 8 n. 1. That statute, however, provides only that a mediator is generally not "competent to testify, in any subsequent civil proceeding or administrative hearing, as to any statement, conduct, decision, or ruling, occurring at or in conjunction with the [mediation]." Under the statute, then, the mediator clearly could not be called to testify in this proceeding, nor could he submit an affidavit in connection with this proceeding. But nothing on the face of the statute appears to prevent a party from introducing otherwise admissible evidence of what a mediator said. In this case, the evidence of the mediator's statement comes from Sonnesyn, not the mediator him-

self, and that evidence is not hearsay because it is not being offered to prove the truth of the matter asserted by the mediator (i.e., that Sheehy was, in fact, unwilling to take less than $2 million), but to prove what information was (and was not) being conveyed to Sonnesyn, so that the reasonableness of Cincinnati's conduct can be assessed in light of the information that was available to it at the time.

It is possible that evidence of the mediator's statement to Sonnesyn might be barred by subdivision 1(*l*) of § 595.02. But CB has not cited that subdivision. It is also not clear whether that subdivision would apply in this federal action. Finally, it is not clear how, if that subdivision did apply, an insurer (such as Cincinnati) could defend itself from a bad-faith claim (such as CB's) that is premised at least in part on how the insurer acted or failed to act at a mediation. Presumably, the Minnesota courts would find that § 595.02, subd. 1(*l*) does not apply in an action in which a party's conduct at a mediation itself provides the basis for a claim or a defense— just as the attorney-client privilege must give

his $2 million demand. Sonnesyn Dep. 53. Correspondence from Sheehy bears this out: In a handwritten note dated January 14, 2003 (the date of the mediation), Sheehy set forth the $2 million demand and further stated that the demand would expire—i.e., that Sheehy would no longer be willing to accept $2 million to settle the case—later that day or on the presentation of a counteroffer. Hanson Aff. Ex. L. Sheehy reiterated these terms in a typed letter dated the following day. Hanson Aff. Ex. M.

On January 20, 2003, about a week after the mediation, Sonnesyn forwarded Sheehy's January 15 letter to CB, and recommended that CB retain personal counsel in light of Sheehy's demand for the policy limits. Hanson Aff. Ex. T. Cincinnati had already advised CB early in the case of the risk of an excess verdict, of the fact that CB would be responsible for any amount in excess of the $2 million policy limits, and of CB's right to retain personal counsel. Hanson Aff. Ex. Q. In February 2003, Sonnesyn sent a written update about the trial schedule to CB in which he stated that there was a possibility that damages might exceed $2 million, although he called that possibility "unlikely." Hanson Aff. Ex. R.

About a month before trial, Cincinnati asked Sonnesyn to conduct verdict research.[6] Sonnesyn Dep. 92–93. On March 7, Sonnesyn sent Cincinnati summaries of fifty-two wrongful-death cases, with the resulting settlement or verdict amounts.

Hanson Aff. Ex. I. In only two of the fifty-two cases had the verdict or settlement exceeded $2 million. Hanson Aff. Ex. I. This research did not change Sonnesyn's evaluation of the case. Sonnesyn Dep. 133–34. On March 6, Sonnesyn sent a letter to Victory summarizing the case. Hanson Aff. Ex. S. In that letter, Sonnesyn stated that he anticipated that Sheehy would seek $3 million in damages. Hanson Aff. Ex. S. Sonnesyn acknowledged that there was a possibility of a verdict over $2 million, but said that, in his opinion, that possibility was remote. Hanson Aff. Ex. S.

Trial began on March 10, 2003. CB admitted liability and causation; thus, the only issue was the amount of damages. Hanson Aff. Ex. R. Cincinnati did not send a representative to observe the trial. Sonnesyn Dep. 95–96. The trial went about as Sonnesyn had anticipated; there were no surprises that caused him to change his evaluation of the case. Sonnesyn Dep. 98. The jury began deliberating on March 13. Sonnesyn Dep. Ex. 16 at 11. While the jury was deliberating, Charles told Sonnesyn that he wanted Cincinnati to offer more money. Sonnesyn Dep. 98. Sonnesyn spoke to Marty Skidmore, Victory's supervisor, and asked if Cincinnati would increase the offer to the $600,000–$700,000 range. Sonnesyn Dep. 101. Skidmore authorized an additional $75,000. Sonnesyn Dep. 101. Sonnesyn tried to discuss this increase with Olson's counsel, but was "rebuffed."[7] Sonnesyn Dep. 101. On March

---

way when a legal-malpractice claim is brought against an attorney by a former client. In any event, even if the mediator's statement to Sonnesyn was not admissible, the record would nevertheless contain no evidence that Cincinnati was given any reason to believe that Sheehy would move off his $2 million demand.

6. CB contends that Cincinnati failed to request verdict research until three days before trial, citing Victory's deposition testimony.

The record is clear, though, that Victory's March 7 request was a repeat of an earlier request made sometime around February 1. Victory Dep. 37–38.

7. CB cites Sonnesyn's deposition to support its claim that "Mr. Sonnesyn decided not to communicate the additional authority to counsel for the Olson plaintiffs." Pl.'s Resp. Mem. Def.'s Mot. Summ. J. 12. To the contrary, Sonnesyn testified that "I talked to Mr. Sheehy or Mr. Snyder, I don't recall, and I

17, 2003, the jury returned a verdict of $3,040,054.71. Hanson Aff. Ex. X. The jury apportioned 50% of the fault to EZ Rolloff, Hanson Aff. Ex. X, but, by the time of trial, EZ Rolloff had no assets and was essentially defunct, Hanson Aff. Ex. S.

Three weeks after the trial, CB moved for a new trial, judgment notwithstanding the verdict, and remittitur, all of which the trial court denied. In preparing the motion, Sonnesyn expanded the scope of his verdict research to include cases from other states. The trial court denied CB's motion, and the parties later settled, with Cincinnati contributing its entire policy limits, and with CB contributing $673,737.00 of its own money. Hanson Aff. Ex. Y. CB now seeks to recover its contribution from Cincinnati.

## II. ANALYSIS

### A. Standard of Review

A party is entitled to prevail on a motion for summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R.Civ.P. 56(c). In considering a motion for summary judgment, a court must consider the nonmoving party's evidence to be true and draw all justifiable inferences arising from the evidence in that party's favor. *Taylor v. White*, 321 F.3d 710, 715 (8th Cir.2003). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial,'" and summary judgment must be granted. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

### B. Bad–Faith Failure to Settle

 The parties agree that Minnesota law governs CB's bad-faith claim. In Minnesota, an insurer, when defending and indemnifying its insured, must further the best interests of the insured. *Short v. Dairyland Ins. Co.*, 334 N.W.2d 384, 387 (Minn.1983). Of particular relevance to this case, the insurer must exercise good faith in considering an offer to compromise a claim against its insured for an amount within policy limits. *Id.* The insurer must give the same consideration to its insured's financial exposure that it gives to its own exposure. *Id.* In deciding whether to settle or to go to trial, the insurer must evaluate the claim as if there were no policy limits applicable to it. *Lange v. Fid. & Cas. Co. of N.Y.*, 290 Minn. 61, 185 N.W.2d 881, 884 (1971). If the insured is clearly liable, the insurer breaches its duty if its refusal to settle within the policy limits is not made in good faith and not based on reasonable grounds to believe that the amount demanded is excessive. *Short*, 334 N.W.2d at 388.

CB is understandably frustrated that Cincinnati had an opportunity to settle the Olson action for the $2 million policy limits, that Cincinnati did not take advantage of that opportunity, and that, as a result, CB was stuck paying almost $700,000 out of its own pocket. It is impossible not to feel sympathy for CB. But the law does not impose no-fault or strict liability on insurers. As long as an insurer acts rea-

---

indicated we've got a little bit more money. Would you be interested? And I was re-buffed." Sonnesyn Dep. 101.

sonably and in good faith, it may reject a policy-limits demand that it determines is too high without exposing itself to liability if the judgment eventually exceeds the policy limits.

At first glance, Cincinnati appears to have acted reasonably and in good faith in its handling of the Olson case—even though, using 20/20 hindsight, it is clear that both Cincinnati and CB would have been better served if Cincinnati had accepted Sheehy's $2 million demand. Indeed, Cincinnati seems to have done just about everything right:

First, Cincinnati retained Sonnesyn on CB's behalf. Sonnesyn was a competent and experienced lawyer. He had a long track record with Cincinnati, having represented Cincinnati insureds in 80 prior matters. He not only had a great deal of experience as a defense lawyer, but he had a great deal of experience handling wrongful-death cases—having handled over 100 such cases, and having tried ten to a verdict. Sonnesyn also had extensive experience in the jurisdiction in which the Olson case would be tried.

Second, Sonnesyn was personally involved in every significant aspect of the case. He conducted thorough discovery. He saw the key witnesses with his own eyes. He tried the case himself. He knew the file inside and out. There is no suggestion that Sonnesyn did not keep himself well informed about the case.

Third, Sonnesyn carefully assessed the settlement value of the case in light of the underlying facts and his own experience in defending many other wrongful-death claims. He did not simply pick a number out of thin air, nor did he take lightly his responsibility to assess the settlement value. Rather, he provided specific, credible reasons supporting his assessment.

Fourth, Sonnesyn did not stick his settlement estimate in a drawer and forget about it. He continued to revise his estimate of the settlement value of the case as the case progressed. He paid close attention to developments in the case. He changed his evaluation when he thought developments warranted it.

Fifth, as will be further discussed below, nothing in the record suggests that Sonnesyn's evaluations were unreasonable. Indeed, CB's own expert witness conceded that Cincinnati's $500,000 settlement offer was "fair." Solum Dep. 95 It would be highly unusual to hold an insurer liable for bad-faith failure to settle when the plaintiff's own expert witness believes that the insurer's settlement offer was reasonable.

Sixth, Cincinnati gave Sonnesyn settlement authority consistent with his estimates of the settlement value of the case. Cincinnati always gave Sonnesyn settlement authority that was within the range of the settlement values that he recommended. As Sonnesyn raised his assessment of the settlement value of the case, Cincinnati raised his settlement authority.

Seventh, shortly after the mediation, Cincinnati set its reserve at $500,000, and later raised its reserve to $525,000, suggesting that its "external" and "internal" evaluations of the case were consistent. This is not a case in which an insurance company set its reserve at, say, $500,000, while authorizing defense counsel to offer only, say, $100,000. This is a case in which the settlement authority closely tracked the internal reserves.

Eighth, Cincinnati was far from indifferent to the reasonableness of its settlement position. Rather than simply accept Sonnesyn's assessment of the settlement value of the case—which it likely had the right to do—Cincinnati instead asked Sonnesyn to "round-table" the case with his partners, and then later asked Sonnesyn to conduct verdict research. Nothing in this consultation or research suggested that

Sonnesyn's assessments were unreasonable.

Ninth, Cincinnati continued to make offers to the plaintiff even though Sheehy, the plaintiff's counsel, never gave any indication that he was willing to budge off his $2 million demand.

Finally, Cincinnati kept CB well-informed about the proceedings. Most importantly, Cincinnati told CB of the potential for a verdict in excess of policy limits, of CB's responsibility for any excess, and of CB's right to retain personal counsel. After the mediation, Sonnesyn affirmatively recommended that CB retain personal counsel.

To be clear: The Court in no way suggests that, in order to avoid breaching its duty to act reasonably and in good faith, a liability insurer must do all of these things. To the contrary, the Court's point is that Cincinnati did all of these things, despite the fact that not all of these things were required. Cincinnati's only mistake was in underestimating the size of the verdict that the jury would return. "A mere mistake in judgment does not, standing alone, constitute bad faith. No mortal has the gift of prophecy." *Peterson v. Am. Fam. Mut. Ins. Co.*, 280 Minn. 482, 160 N.W.2d 541, 544 (1968) (quotations omitted).

CB nevertheless argues that Cincinnati acted in bad faith in four distinct ways: (1) Cincinnati did not evaluate the Olson case reasonably; (2) Cincinnati did not take CB's financial exposure into account; (3) Cincinnati did not try to negotiate a settlement after the failed mediation; and (4) Cincinnati did not inform CB of a conflict of interest. The Court will consider each of these arguments in turn.

### 1. Failure to Fairly Evaluate the Olson Case

CB argues that Cincinnati failed to evaluate the Olson case fairly because it relied entirely on Sonnesyn's evaluation of the claim. CB claims that fiduciaries may not delegate the performance of their duties, citing *Schug v. Michael,* 310 Minn. 22, 245 N.W.2d 587 (1976). CB is incorrect about both the facts and the law.

On the facts: Cincinnati did *not* rely entirely on Sonnesyn's evaluation. Instead, it asked Sonnesyn to "round-table" his evaluation with his partners, and, a month before trial, it asked Sonnesyn to do verdict research to ensure that his estimate—and that of his partners—were reasonable.

On the law: *Schug* was not an insurance bad-faith case and did not involve, much less discuss, a claim that the fiduciary impermissibly delegated the performance of his duties. CB cites no case holding that an insurer may not rely on the insured's counsel for an evaluation of the case.

It is unsurprising that CB has found no such case. Insurers are *supposed* to rely on the advice of the insured's counsel. They are supposed to do exactly what Cincinnati did here: Hire a competent and experienced defense attorney—in this case, an attorney whose judgment Cincinnati trusted, who had a great deal of experience handling wrongful-death cases, and who was familiar with the relevant jurisdiction—and take seriously what that attorney says about the settlement value of the case. When Cincinnati relied on Sonnesyn's advice, it was not *delegating* its fiduciary duties; it was *fulfilling* them.

CB cites no reason why Cincinnati should have doubted the estimates of Sonnesyn and his partners. CB also cites no reason to believe that the evaluation of a claims adjuster in Illinois would have been more reliable than the evaluation of an experienced defense attorney in Minnesota. And, although CB argues that there is a danger that counsel retained by an insurer will feel compelled to protect the insurer's interests at the ex-

pense of the insured's, CB offers no evidence that Sonnesyn (and his partners) did so in this case—nor even a coherent theory as to how Sonnesyn (and his partners) could possibly have been protecting Cincinnati's interests at the expense of CB's by lying to the company about the settlement value of the case. *See Willert v. Stockwell Constr., Inc.,* No. A05–791, 2006 WL 279080, at *8–9 (Minn.Ct.App. Feb.7, 2006) (reversing the trial court's finding that the insured's attorney was the insurer's "instrument" because the law presumes that the attorney represented the insured faithfully and the insured presented no evidence to the contrary).

█ CB also quibbles with Sonnesyn's pretrial verdict research, contending that it was too little, too late. CB points out that Sonnesyn's *post*-trial research uncovered sixteen wrongful-death cases in which the verdict exceeded $2 million. There are at least a couple of problems with CB's argument.

First, CB cites no case suggesting that Cincinnati was required to do *any* verdict research—pretrial or post-trial. Here, an attorney with a great deal of relevant experience and a proven track record, after reviewing the file carefully, and after discussing the case at length with his partners, estimated the settlement value of the case and gave a specific, credible explanation of the reasons for his estimate. The Court is unaware of any case suggesting that more was required. The fact that Cincinnati went on to ask the attorney to do verdict research is to Cincinnati's credit, but it likely was not legally required.

Second, having done the verdict research, Cincinnati of course had to consider it carefully. But CB has no evidence that Cincinnati failed to do so. In focusing only on the post-trial research, CB ignores the fact that, before trial, Sonnesyn sent Cincinnati summaries of fifty-two wrongful-death cases that had been filed in Minnesota courts and were governed by Minnesota law. Only *two* of these fifty-two cases resulted in verdicts or settlements exceeding $2 million, and none of the verdicts or settlements caused Sonnesyn to change his evaluation.

After the trial, in connection with his post-trial motions, Sonnesyn did expand his verdict research to take into account wrongful-death cases from outside Minnesota, and he did find that, in sixteen of the ninety-one cases he considered, the verdict or settlement exceeded $2 million. But this does not remotely suggest that Sonnesyn's pretrial estimate of the settlement value of the Olson case was unreasonable. For one thing, the vast majority of the out-of-jurisdiction cases that Sonnesyn found did *not* result in verdicts or settlements exceeding $2 million. For another, using verdict research to assess the reasonableness of a settlement evaluation is difficult because apples-to-apples comparisons are almost impossible. CB's own expert put well the difficulty of evaluating the settlement value of wrongful-death cases:

> I think everybody that works in this area knows that wrongful death cases … are tough to measure because you're talking about a jury's determination of loss of a loved one, and the loss to maybe not just one person, but a number of people. And that's got so many variables, both in terms of what that jury panel looks like, what their experience has been in life, some of which you're never going to know, and how these [witnesses] come across, and how they move the jury to understand how hurtful the loss has been to their family. And it's—it's a crapshoot.

Solum Dep. 95–96.

For Cincinnati to know that sixteen of ninety-one wrongful-death cases outside of Minnesota resulted in verdicts or settlements exceeding $2 million tells the insur-

er very little about the settlement value of the Olson case, precisely because, as CB's expert explained, so much of what goes into a particular verdict or settlement depends on factors that "you're never going to know[.]" *Id.* The existence of sixteen recoveries that exceeded $2 million does not make Sonnesyn's evaluation unreasonable, any more than the existence of seventy-five recoveries that did not exceed $2 million makes Sonnesyn's evaluation reasonable. In an area such as wrongful death—where, as CB's expert explained, verdicts depend so much on highly subjective factors that vary from case to case—verdict research has little value in assessing the reasonableness of a settlement evaluation. When the verdicts are from outside of the relevant jurisdiction, the research has even less value.[8] To the extent that the research had any value in this case, the research supported Sonnesyn's assessment far more than it called it into question.

Next, CB notes that the trial judge found the jury's verdict to be reasonable. That tells us almost nothing, however, because of the difference between settlement offers and verdicts. Suppose that an insurer knew, with absolute certainty, that there was a one-in-ten chance that a jury would return a $1 million against its insured, and a nine-in-ten chance that the jury would return a defense verdict. In such a case, $100,000 would unquestionably be a reasonable settlement offer. That would not change if the verdict came in at $1 million, and the judge upheld the verdict as reasonable. A settlement offer is not unreasonable because it does not match or exceed the worse-case verdict scenario.

Moreover, when faced with a motion for judgment notwithstanding the verdict or remittitur, judges give substantial deference to the jury's verdict. *See, e.g., Kinikin v. Heupel,* 305 N.W.2d 589, 596 (Minn.1981); *Brubaker v. Hi–Banks Resort Corp.,* 415 N.W.2d 680, 683 (Minn.Ct. App.1987). Even *unreasonable* verdicts must be upheld, as long as those verdicts do not "so greatly exceed what is adequate as to be accountable on no other basis than passion and prejudice." *Kinikin,* 305 N.W.2d at 596 (citing *DeWitt v. Schuhbauer,* 287 Minn. 279, 177 N.W.2d 790 (1970)). That is even more reason why the fact that the trial judge declined to overturn the verdict against CB did not mean that Cincinnati's evaluation of the settlement value of the case was unreasonable.

Finally, CB argues that even if—as its own expert witness conceded, Solum Dep. 95—Cincinnati's $500,000 settlement offer was reasonable, Cincinnati can still be held liable because higher offers would *also* have been reasonable. Cincinnati seems to claim that the law requires an insurer to identify a range of reasonable settlement values and then offer the plaintiff the highest such value.

CB cites no case suggesting that insurers have such an obligation. That is not surprising. Minnesota law requires insurers to act reasonably and in good faith. If, at the time of a car accident, a driver was traveling at 30 m.p.h., and if that speed was reasonable, then the driver is not liable for excessive speed, even if it would *also* have been reasonable for the driver to travel at 29 m.p.h. If, in this case, Cincinnati offered $500,000 to settle the case, and that offer was reasonable, then Cincinnati

---

**8.** In this case, for example, Cincinnati points out that five of the sixteen verdicts were from Michigan, which permits recovery of damages that are not recoverable in Minnesota. *Compare* Mich. Comp. Laws § 600.2922(6) (permitting recovery for pain and suffering experienced by the decedent), *with* Minn.Stat. § 573.02 (permitting recovery for "pecuniary loss resulting from the death").

is not liable for bad faith, even if it would also have been reasonable for Cincinnati to offer $600,000. Cincinnati has submitted ample evidence—including the testimony of CB's own expert—that $500,000 was a reasonable offer. CB has submitted no evidence that $500,000 was not a reasonable offer. Cincinnati is entitled to summary judgment.

### 2. Failure to Consider CB's Financial Exposure

 Under Minnesota law, when an insurer is confronted with an offer to settle a claim against its insured (such as Sheehy's $2 million demand), the insurer must give the same consideration to its insured's financial exposure that it gives to its own exposure. *Short,* 334 N.W.2d at 387. Specifically, the insurer must evaluate the claim as if there were no policy limits applicable to it. *Lange,* 185 N.W.2d at 884. CB claims that Cincinnati violated this duty and cites as its "most compelling evidence" that Cincinnati's $500,000 offer at the mediation was only the mid-point of Sonnesyn's estimate of a possible verdict. Because Cincinnati would have been liable for the total amount of the verdict up to the policy limits, CB contends, Cincinnati's failure to offer at least the full amount of the estimated verdict demonstrates bad faith. Indeed, CB makes the rather startling argument that sometimes an insurer must not only offer more than the reasonable *settlement value* of the case, but even more than the likely *verdict*:

> In the realm of giving consideration to the financial exposure of the insured in negotiating settlement, the only important manifestation of consideration is the insurer's willingness, or lack thereof, to spend some of its money to protect the insured—even if, in so doing, the insurer offers more than what it considers to be

its best guess as to the potential verdict, *i.e.,* its own financial exposure.

Pl.'s Resp. Mem. Def.'s Mot. Summ. J. 22. CB's argument reflects confusion about Minnesota law.

Minnesota cases holding that the insurer must give the same consideration to its insured's financial exposure that it gives to its own exposure—or that the insurer must evaluate the claim as if there were no policy limits applicable to it—are addressed to the following situation: Suppose that, before trial, the insurer reasonably estimates that there is a 50% chance that the jury will return a $2 million verdict against its insured and a 50% chance that the jury will return a defense verdict. Suppose further that the liability limits on the policy covering the insured are $1 million.

In this situation, the reasonable settlement value of the case is about $1 million.[9] A reasonable person facing a 50% prospect of a $2 million verdict (and a 50% prospect of a defense verdict) would offer up to $1 million to settle the case. It would be irrational for him or her to offer more. But if the insurer is permitted to consider only its financial interests, it will not offer $1 million. That is because, thanks to the $1 million policy limits, there is a 50% chance that the insurer will pay $1 million (if the jury returns the $2 million verdict against the insured) and a 50% chance that the insurer will pay nothing (if the jury returns a defense verdict). It would be irrational for an insurer that was concerned only about its own financial interests to make a settlement offer of $1 million—even though that is the reasonable settlement value of the case—when the most that it might have to pay is $1 million (and there is only a 50% chance of that).

---

9. For the sake of simplicity, the Court is omitting secondary factors—such as anticipated defense costs—that might influence the assessment of the settlement value of the case.

The Minnesota cases on which CB relies are intended to protect the insured in precisely this situation—the situation in which the likely verdict exceeds the policy limits, and thus the "reasonable settlement value" when the policy limits are taken into account is substantially less than the "reasonable settlement value" when the policy limits are not taken into account. Minnesota cases prohibit the insurer from considering only its own financial interests; the insurer is not permitted to decide, in essence, that because it has only a 50% chance of paying its $1 million policy limits, it will offer only $500,000 to settle a claim that is otherwise worth $1 million. Instead, the insurer must give equal consideration to the insured's financial interests by evaluating the claim as if no policy limits applied. When the insurer evaluates the claim in that manner, it will offer the $1 million policy limits—the reasonable settlement value of a case in which there is a 50% chance of a defense verdict and a 50% chance of a $2 million verdict.

Now consider a situation closer to the present case: Suppose again that, before a trial, an insurer reasonably estimates that there is a 50% chance that the jury will return a $2 million verdict against its insured and a 50% chance that the jury will return a defense verdict. Suppose further that the policy limits on the policy covering the insured are now $3 million. In this situation, the reasonable settlement value is still $1 million, and thus, if the insurer does not consider the policy limits, it will offer $1 million. But even if the insurer *does* consider the policy limits, it will offer exactly the same $1 million. Because the predicted verdict is well within the policy limits—that is, because the insurer expects that it will have to pay every penny of the verdict—the insurer will evaluate the settlement value of the case no differently than would an uninsured defendant.

In this latter situation, CB implausibly argues that, although the reasonable settlement value of the case—even when policy limits are ignored—is $1 million, Minnesota law requires the insurer to offer *more* than the reasonable settlement value. Even more implausibly, CB argues that, although there is only a 50% chance of the jury returning a $2 million verdict, the insurer must offer more than $2 million— as CB puts it, "more than what [the insurer] considers to be its best guess as to the potential verdict, *i.e.*, its own financial exposure." Not surprisingly, CB cites no case from any jurisdiction that supports its contention that an insurer is obligated to offer more than the reasonable settlement value of a case. The bottom line is that, when an insurer reasonably evaluates the settlement value of a case as $x$—and the insurer bases that evaluation only on the merits of the case, without in any way considering its policy limits—the law requires the insurer to offer $x$ (and no more) to settle the case.

That is exactly what Cincinnati did in this case. As discussed above, Sonnesyn estimated the settlement value of the case at $400,000, and, following the "round-table," he and his partners estimated the settlement value of the case at $400,000 to $600,000. No evidence suggests that they based these estimates on anything but the merits of the case. No evidence suggests that they in any way considered the policy limits in reaching these estimates. No evidence suggests that, had they been evaluating the case on behalf of an uninsured client, they would have reached a different estimate. Cincinnati offered $500,000 to settle the case at the mediation, and then $575,000 to settle the case at the trial. It did all that the law required.

### 3. Failure to Negotiate After the Mediation

CB argues that Cincinnati's failure to pursue negotiations after the failed

mediation is evidence of bad faith. CB is incorrect.

When a case does not settle, an insured can *always* claim that the insurer should have made one more phone call or asked for one more meeting. If the insurer makes three phone calls, the insured can argue that it should have made four. If the insurer makes 3000 phone calls, the insured can argue that it should have made 3001. All that the law requires is that the insurer behave reasonably.

Cincinnati behaved reasonably. Both Sonnesyn and a representative of the company attended the mediation. Before the mediation, they studied the file carefully; they reasonably assessed the settlement value at $400,000 to $600,000; and they reasonably assessed the chances of a verdict exceeding the $2 million policy limits as remote. Sheehy opened with a $2 million demand. Cincinnati countered with a $250,000 offer. Sheehy responded by again demanding $2 million. Bidding against itself, Cincinnati raised its offer to $500,000. Sheehy responded by again demanding $2 million—and, the day following the mediation, yet again demanded $2 million. Having seen no evidence that Sheehy was willing to budge off his $2 million demand—and having reasonably assessed the settlement value of the case at $400,000 to $600,000—Cincinnati left its $500,000 offer on the table, but declined to continue to bid against itself.

Undoubtedly, many reasonable attorneys would have handled this situation differently. Some might have opened the bidding at $200,000 or $300,000, instead of $250,000. Some might have raised the initial $250,000 offer to $350,000 or $400,000, instead of to $500,000—and then perhaps bumped the offer to $500,000 a few weeks after the mediation, or shortly before the trial. But any failed settlement negotiation can be second-guessed. All that is required of an insurer is that it act reasonably. Cincinnati reasonably evaluated the case at $400,000 to $600,000; it offered $500,000 at the mediation; and, when Sheehy showed no willingness to move off of his $2 million demand, it concluded that, although it would leave its offer on the table, the next move would have to be Sheehy's. There is nothing unreasonable about this course of conduct.

CB has a further problem with its argument. Even if, in the abstract, a jury could conclude that Cincinnati should have called Sheehy once—or twice—or three times after the failed mediation, there is no evidence that Cincinnati's failure to do so caused any damage to CB, because there is no evidence that more phone calls would have caused Sheehy to reduce his demand to a figure even remotely close to what Cincinnati was willing to pay. CB cites extensively from Sheehy's after-the-fact deposition testimony. But Sheehy's testimony does not help CB. About the most that Sheehy will say is that, even though he told Cincinnati three times at the mediation that he demanded $2 million to settle the case, and even though he wrote to Cincinnati the day after the mediation and repeated that he demanded $2 million to settle the case, and even though he never communicated to Cincinnati any willingness to move off of his $2 million demand, he still might have taken less than $2 million to settle the case. This falls far short of evidence that, had Cincinnati just made phone calls to Sheehy after the mediation, he would have dropped his demand from $2 million to anywhere close to the $600,000 that represented the high end of Cincinnati's estimate of the settlement value of the case.

### 4. Failure to Inform of Conflict of Interest

An insurer may be held liable for bad faith if it fails to inform its insured of a potential conflict between its interests

and those of its insured. *See Lange,* 185 N.W.2d at 885–86; *Kissoondath v. U.S. Fire Ins. Co.,* 620 N.W.2d 909, 919 (Minn. Ct.App.2001) (citing *Lange*). CB argues that Cincinnati failed to inform it of a conflict of interest, essentially because Cincinnati never used the words "conflict of interest." [10]

CB is nitpicking. There is no dispute that Cincinnati timely informed CB—and that CB fully understood—that (1) CB had $2 million of insurance coverage; (2) there was a risk of a verdict exceeding $2 million; (3) CB would be personally liable for the portion of a verdict that exceeded $2 million; and (4) CB had the right to retain personal counsel to protect its interests. In addition, Sonnesyn affirmatively recommended to CB that it retain personal counsel. What matters is the substance, not the form, of the information communicated to the insured. "[T]here is no Minnesota caselaw . . . that suggests that the phrase 'conflict of interest' must be used verbatim or that the failure to use it constitutes bad faith." *Willert,* 2006 WL 279080, at *9. In light of these undisputed facts, no reasonable jury could find that Cincinnati failed to inform CB about a potential conflict of interest.

CB argues that, in *Willert,* the insurer sent letters to its insured that provided more specific information about a potential conflict, yet the court held that the letters merely created a factual issue concerning whether the insurer had sufficiently advised its insured about the existence of a potential conflict. When compared to the insurer's letters in *Willert,* CB claims, Cincinnati's and Sonnesyn's letters were less specific, and thus cannot support summary judgment in Cincinnati's favor.

The problem with CB's argument is that the issue in *Willert* was not the same as the issue in this case. Here, the issue is whether Cincinnati's and Sonnesyn's letters were sufficient, as a matter of law, to fulfill the insurer's duty to advise its insured of a potential conflict. In *Willert,* the insurer did not *ask* the court that question—i.e., the insurer did not ask the court to decide whether the letters that it had sent to its insured were sufficient as a matter of law. Rather, *Willert* was an appeal from a grant of summary judgment in the insured's favor. *Willert,* 2006 WL 279080, at * 1. On appeal, the insurer argued that the trial court should not have entered judgment in the insured's favor because factual issues precluded summary judgment. *Id.* The court agreed with the insurer. The court did not express an opinion—one way or another—about whether the insurer's letters were sufficient to fulfill its duties to the insured.

Again, in this case there is no dispute that Cincinnati informed CB that CB had only $2 million in coverage, that an excess verdict was possible, that CB would be responsible for the amount by which any verdict exceeded the policy limits, and that CB had the right to retain personal counsel to protect its interests. The Court is unwilling—on the basis of such weak authority as *Willert*—to hold that an insurer who communicates all of this information to an insured may nevertheless be held to have acted in bad faith for failing to be specific enough in its explanation. In the Court's view, the rule that CB urges would exalt form over substance and would be unworkable as a practical matter. (How specific would be specific enough?) Moreover, the rule that CB urges would give rise to difficult problems of causation, as insureds attempt to prove that, if the insurer had just been more specific in dis-

---

**10.** CB also points out that Sonnesyn, at his deposition, testified that he did not believe that Cincinnati informed CB of a conflict of interest. What matters, though, is not what Sonnesyn understood but what Cincinnati actually communicated to CB.

cussing one point or another, the insured might have hired personal counsel—or a second personal counsel—or better personal counsel—and that attorney might have done one thing or another that might have headed off the excess verdict.

■ Finally, CB cites *Kissoondath* for the proposition that the insurer must do more than inform its insured of "theoretical" risks. In *Kissoondath*, the court held that insurers must inform their insureds both of the likelihood of an excess judgment and of the estimated dollar amount that the insured would be exposed to in the event of an excess judgment. *Kissoondath*, 620 N.W.2d at 919. In this case, although Cincinnati told CB that it believed that an excess verdict was unlikely, it did not express any opinion regarding the dollar amount of possible excess verdicts. This, CB argues, violated *Kissoondath*.

CB is again taking a principle of bad-faith law developed in one context and attempting to apply it in a different context where it does not fit and would prove unworkable as a practical matter. The *Kissoondath* rule that an insurer should inform its insured of the estimated value of an excess verdict makes sense when the insurer has estimated the value of an excess verdict. For example, if, in this case, Cincinnati had estimated that the likely verdict range was $2.5 million to $3 million, then it would make sense to require Cincinnati to tell CB not just that an excess verdict was likely, but that the excess verdict was likely to exceed policy limits by $500,000 to $1 million. Likewise, if, in this case, Cincinnati had estimated that, if the jury made one finding, its verdict would likely be about $500,000—but that, if the jury made a different finding, its verdict would likely be about $3 million—it would make sense to require Cincinnati to share this information with CB.

■ The problem with applying *Kissoondath* in this case, however, is that Cincinnati reasonably concluded that, under *any* scenario, an excess verdict of *any* amount was remote. When an insurer reasonably concludes that an excess verdict will *not* be entered, it is difficult to know how the same insurer can then inform its insured of the likely amount of that nonexistent excess verdict. In this case, for example, Cincinnati determined that a $2.1 million verdict was unlikely, and that a $2.2 million verdict was unlikely, and that a $2.3 million verdict was unlikely, and so on. How, then, could Cincinnati have estimated the amount of an excess verdict? The Court concludes that, when an insurer reasonably determines that there is only a remote chance that an excess verdict of any amount will be entered against the insured, Minnesota law does not require the insurer to go further and place an estimated dollar amount on an excess verdict.

In addition, CB has not submitted any evidence that Cincinnati's failure to estimate the exact amount of an excess verdict caused it any damage. CB knew that it had $2 million in coverage. It knew that Olson would seek far more than $2 million at trial. It knew that it would be personally liable for every dollar that Olson recovered over $2 million. And it knew that it had the right to retain personal counsel to protect its interests. CB has not identified anything that Cincinnati knew, that it did not tell CB, and that, had it been communicated to CB, would have caused CB to act differently. CB has not, for example, suggested what dollar figure Cincinnati should have placed on the unlikely excess verdict, much less suggested what CB would have done differently if that dollar figure had been communicated to it.

The law does not require insurers to be perfect or omniscient. It requires only

that insurers act reasonably and in good faith. On this record, no reasonable jury could find that Cincinnati acted unreasonably or in bad faith in handling Olson's claim against CB. For that reason, Cincinnati's motion for summary judgment is granted.

### ORDER

Based on the foregoing, and on all of the files, records, and proceedings herein, IT IS HEREBY ORDERED THAT defendant's motion for summary judgment [Docket No. 17] is GRANTED, and plaintiff's complaint [Docket No. 1] is DISMISSED WITH PREJUDICE AND ON THE MERITS.

LET JUDGMENT BE ENTERED ACCORDINGLY.